UNITED STATES of America,
Appellant,

v.

Kofoworola ADEGBITE, a/k/a "Gben-ro," a/k/a "Kofo Adegbite," and Joseph Adeniran Obalaja, a/k/a "Niran," Defendants-Appellees.

No. 751, Docket 87–1485.

United States Court of Appeals,
Second Circuit.

Argued Feb. 16, 1988.

Decided May 6, 1988.

Opinion May 13, 1988.

David C. James, Brooklyn, N.Y., Asst. U.S. Atty., E.D.N.Y. (Andrew J. Maloney, U.S. Atty., E.D.N.Y., John Gleeson, Asst. U.S. Atty., E.D.N.Y., Brooklyn, N.Y., of counsel), for appellant.

Daniel Meyers, New York City, for defendant-appellee Adegbite.

Richard I. Rosenkranz, Brooklyn, N.Y., for defendant-appellee Obalaja.

Before KEARSE and MAHONEY, Circuit Judges, and GLASSER *, District Judge.

MAHONEY, Circuit Judge:

The United States brings this expedited appeal pursuant to 18 U.S.C. § 3731 (1982 and Supp. IV 1986) seeking reversal of an oral order of the United States District Court for the Eastern District of New York, Edward R. Korman, Judge, which occurred in the course of a suppression hearing on October 22, 1987 and was entered on October 26, 1987. The order suppressed statements made by both defendants, Kofoworola Adegbite and Joseph Adeniran Obalaja, and physical evidence provided by defendant Obalaja, as the fruit of an illegal seizure. In addition, one statement of defendant Adegbite was suppressed on the alternative ground that it was the product of an illegal custodial interrogation under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[1]

Specifically, the district court held that when two Drug Enforcement Administration ("DEA") agents waved down an ice cream truck in which defendants were departing from a garden apartment complex in order to obtain identification from the occupants to determine whether they were the subjects of two arrest warrants, a seizure in violation of the fourth amendment occurred because the agents had no reasonable suspicion that the truck's occupants were in fact the persons described in the arrest warrants. The court also held that when an agent who, subsequent to the stop, successfully asked Adegbite for confirmation that he was in fact "Gbenro," the name listed on one arrest warrant, Adegbite's affirmative response must be suppressed on the alternative ground that defendant Adegbite was in custody for *Miranda* purposes and was asked to confirm his identity before he was read his *Miranda* rights.

We reverse the suppression order on the grounds that stopping the truck did not constitute a seizure, and that the inquiry concerning Adegbite's identity did not constitute custodial interrogation prohibited by *Miranda*.

### Background

On March 24, 1987, one Olasogi Olukoya was apprehended at the John F. Kennedy International Airport with approximately a half pound of heroin in his possession. On April 15, 1987, Olukoya informed a DEA agent that his instructions were to deliver the heroin upon arrival to a man named "Niran" at the airport, and if Niran was not there to call him at telephone number (301) 485–5997. Under DEA supervision, Olukoya placed a recorded call to that number on April 15, 1987 and spoke to a man named "Gbenro" in Yoruba, a Nigerian dialect, about the amount and delivery of the heroin. There followed a second recorded phone call to the same number on April 16, 1987, also monitored by the DEA, in which Olukoya talked with Gbenro and a man named "Niran." In a third call on April 17, 1987 Olukoya made arrangements with Niran for delivery of the heroin.

Magistrate A. Simon Chrein of the Eastern District of New York issued "John Doe" arrest warrants on May 1, 1987 for two men with the nicknames/aliases "Gbenro" and "Niran" who were described in the warrants as males "fluent in Yoruba, a Nigerian dialect, residing at 24 Walden

---

* The Honorable I. Leo Glasser, United States District Judge for the Eastern District of New York, sitting by designation.

1. *But see infra* note 6.

Maple Court, Baltimore, Maryland, 21207, and reached at telephone number (301) 485–9597."

DEA agents in Baltimore thereafter ascertained that this telephone number was registered to 4410 Franconia Drive, Apartment J, Baltimore, Maryland, rather than to the address specified in the warrants.[2] They also ascertained that the number had been changed to an unlisted number, which they obtained. On May 6, 1987, a DEA agent called the new telephone number at that address and was advised that Gbenro and Niran, although resident there, were not then available, but would be the following morning. As a result, the next morning three DEA agents, Agents Czerski, Dombroski and Masiello, and local police detective Fischer went to 4410 Franconia Drive in two cars with the arrest warrants. Two of the agents, Agents Masiello and Dombroski, had worked with the DEA Nigerian Task Force in the Washington, D.C. area, an operation to investigate and interdict the trafficking of heroin by Nigerians.

Upon their arrival, Agents Masiello and Czerski saw two men whom Masiello deemed to be Africans because of their "sloppy," "[n]ot well coordinated" dress and "oily" skin in a Jack and Jill ice cream truck in a parking lot in front of the 4410 Franconia Drive building, a garden apartment complex of approximately twelve units. The agents approached the ice cream truck, which had travelled approximately fifteen to twenty yards, and waved their arms to flag it down. The agents wore plain clothes and displayed no guns or badges. When the truck stopped, the two officials identified themselves and requested identification of the driver. The driver produced a driver's license in the name of "Joseph Adeniran Obalaja," whereupon the agents noticed that the latter portion of the middle name on the license was "niran," as on the arrest warrant.

Shortly thereafter, Agent Dombroski and Detective Fischer, who had arrived earlier to stake out the building, left their car, walked to the other side of the truck and requested identification of the passenger. They were in plain clothes and did not display firearms. The passenger responded that his identification was in his room in Apartment J of the building, and asked if he could retrieve it. Accompanied by Dombroski and Fischer, the passenger went up to Apartment J and proceeded to the back bedroom, subsequently identified as his residence, but was unable to produce any identification. On the way, Agent Dombroski asked the passenger what tribe he belonged to, to which he responded "Yoruba."

Meanwhile, the agents who had remained with Obalaja asked him for additional identification. In the process of reaching into his pocket, Obalaja dropped an envelope addressed to "Niran Obalaja" with the name "Gbenro," among others, listed on the back. Upon being asked by Agent Masiello for the identity of the addressee on the envelope, Obalaja then responded that he was also known as "Niran." Those agents and Obalaja then went up to Apartment J, where they joined the others.

While in the apartment, Obalaja received a phone call from another agent who was unaware of the planned arrest. Obalaja answered the telephone: "this is Niran." Agent Masiello asked Adegbite once again if he had any identification, and told him it would be in his best interest to produce some. Again, no identification was presented. Agent Masiello then asked: "you are Gbenro, aren't you?", to which Adegbite responded affirmatively. The agents then arrested the two men, read them their *Miranda* rights, and brought them to the Baltimore office of the DEA.

In an oral opinion delivered on October 22, 1987, Judge Korman granted the defendants' motion to suppress the statements of both defendants and the physical evidence taken from Obalaja as the fruit of an illegal seizure. Judge Korman specifically determined that waving down the moving ice cream truck constituted a seizure under the fourth amendment, and that there was no reasonable suspicion for the

---

**2.** An application to amend the arrest warrants accordingly was made to Magistrate Chrein on

May 12, 1987, after defendants were arrested. *See infra* note 5.

agents to believe that the two men in the truck were the two men listed in the arrest warrant.

Judge Korman also suppressed Adegbite's acknowledgment to Agent Masiello that he was "Gbenro" on the independent ground that Adegbite was in custody for *Miranda* purposes at that time, and the response was the fruit of an illegal custodial interrogation. Judge Korman based this determination upon his conclusion that Adegbite did not feel free to leave under the circumstances, and upon the fact that Adegbite was asked if he was "Gbenro" before his *Miranda* rights were read to him.

On appeal, as it did below, the government contends that the initial stop of the defendants was lawful because the agents had warrants for their arrest, and the encounter in any event was not a seizure within the meaning of the fourth amendment. In addition, the government asserts that defendant Adegbite's *Miranda* rights were not violated, since requesting "pedigree" information, such as a name or nickname, does not constitute interrogation that is subject to *Miranda* requirements.

### Discussion

■ The primary question presented by this appeal is whether, in waving down the ice cream truck and asking its occupants for identification, Agents Masiello and Czerski effected a "seizure" in violation of the fourth amendment's proscription of "unreasonable searches and seizures." "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has

in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). Further, "[o]nly if they were seized are defendants vested with any right to constitutional safeguards." *United States v. Knox*, 839 F.2d 285, 289 (6th Cir.1988) (citing *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 1876–77, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).[3] *See also Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); 3 W. LaFave, *Search and Seizure* § 9.2(h), at 402 (1987) (hereinafter "LaFave"). Accordingly, if there was no seizure, then not only is the probable cause required for effecting an arrest not mandated, but even the reasonable suspicion required for a brief detention or *Terry* stop [4] is not necessary.

The test provided by the Supreme Court for determining what constitutes a "seizure" under the fourth amendment, and the point in time when any seizure occurs, is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. *See also Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. at 501–02, 103 S.Ct. at 1326–27; *Terry v. Ohio*, 392 U.S. at 16, 88 S.Ct. at 1877. "Factors which strongly suggest such is the case are, for example, the display of a weapon, physical touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request." *United*

3. Only Justice Rehnquist joined in this portion of Justice Stewart's opinion in *Mendenhall*. See *Mendenhall*, 446 U.S. at 560, 100 S.Ct. at 1880 (Powell, J., concurring in part and concurring in the judgment). This portion of *Mendenhall*, however, as well as the plurality opinion in *Florida v. Royer*, was followed and adopted by the Supreme Court in *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 310–11, 83 L.Ed.2d 165 (1984) (per curiam).

4. A *Terry* stop, so-called because the rule was articulated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct.

1868, 20 L.Ed.2d 889 (1968), is a brief detention that is permissible "'when the officer has reasonable, articulable suspicion that the person *has been*, is, or is about to be engaged in criminal activity.'" *United States v. Hensley*, 469 U.S. 221, 227, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985) (quoting *United States v. Place*, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), emphasis added in *United States v. Hensley*). *See also* LaFave § 9.2(a), at 351 (quoting Model Code of Pre-Arraignment Procedure § 110.2(1)(a)(i) (1975)).

*States v. Sugrim,* 732 F.2d 25, 28 (2d Cir. 1984) (citing *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877). *See also United States v. Ceballos,* 812 F.2d 42, 46 (2d Cir.1987) (applying *Mendenhall* test); *United States v. Streifel,* 665 F.2d 414, 420 (2d Cir.1981) (citing *Terry v. Ohio* rather than *United States v. Mendenhall*). Especially applicable here, the fact that a law enforcement officer so identifies himself, without more, does not result in a seizure. *Florida v. Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24 (citing *United States v. Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877–78).

In applying this test to the facts of this case, we conclude that the defendants were not "seized" within the meaning of the fourth amendment.[5] Agents Masiello and Czerski waved down and approached the ice cream truck in plain clothes and displayed no guns or badges. None of the displays of authority typically evident in cases where seizures were held to have occurred were present in this instance. *See generally* LaFave § 9.2(h), at 416–17.

The district court rejected the government's contention that no seizure occurred here, concluding that the Supreme Court had established a "bright line" rule that stopping a moving vehicle and detaining its occupants constitutes a fourth amendment seizure. *See Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). The normal circumstances of a vehicle stop, however, were not present here. Such stops generally involve abundant displays of authority, including police uniforms, sirens and flashing lights, and signals to pull off the highway. *See* LaFave § 9.2(h) at 416–17.

We regard this situation, where the car had barely started in a parking lot, moved only fifteen to twenty yards, and was waved to a halt by DEA agents on foot and in plain clothes, as being more analogous to the cases of pedestrians and parked cars to which the *Mendenhall* seizure test is applied. *See United States v. Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877–78 (pedestrian); *United States v. Castellanos,* 731 F.2d 979, 983–84 (D.C.Cir.1984) (parked car).

Having legitimately stopped the truck, the agents did not convert the stop into a seizure by identifying themselves and requesting identification of the defendants. *Florida v. Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24. Furthermore, given the facts that the defendants were encountered in front of the address at which they were expected at that time, and that they matched the general description provided to the agents, once Obalaja showed the agents his driver's license with a middle name that ended in "niran," the nickname or alias on one of the arrest warrants, the agents had the requisite reasonable suspicion for a more prolonged stop and investigation.

This brings us to the alternative ground for partial suppression—*i.e.,* the suppression of Adegbite's acknowledgement that he was "Gbenro" because he was in custody for *Miranda* purposes and should have been read his *Miranda* rights before Agent Masiello asked him if that was his nickname. We have held, however, that the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), whether that solicitation occurs before, *United States ex rel. Hines v. LaVallee,* 521 F.2d 1109, 1112–13 (2d Cir.1975), *cert. denied,* 423 U.S. 1090 (1976), or after, *United States v. Gotchis,* 803 F.2d 74, 78–79 (2d Cir.1986), *Miranda* warnings are given.[6] In any event, "the identity of de-

---

5. In view of this conclusion, we need not consider the government's contention that the agents' action was justified as a legitimate execution of arrest warrants.

6. At one stage in the suppression hearing, Judge Korman explicitly suppressed Adegbite's self-identification on *Miranda* grounds. Later in that hearing, however, the following colloquy occurred:

> MR. HATTEM [government counsel]: The only thing being independently suppressed is the statement by Gbenro?
>
> THE COURT: That's right.
>
> MR. DE VITA [government counsel]: During processing, your Honor, certain information

fendants is not suppressible under the exclusionary rule." *United States v. Arias,* 678 F.2d 1202, 1206 (4th Cir.), *cert. denied,* 459 U.S. 910, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982) (citing *United States v. Crews,* 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980)).[7]

### Conclusion

The order to suppress the statements of both defendants and the physical evidence obtained from Obalaja is reversed.

GLASSER, District Judge, dissenting:

Believing that the stopping of the truck did constitute a seizure, I would affirm the suppression order issued by the court below.

The search and seizure jurisprudence spawned by *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), has provided thinly veiled cries of frustration in the effort to distinguish one case from another and to find the touchstones that would serve as reliable guides in arriving at correct Fourth Amendment answers in each case. Illustrative is the frequently cited observation by LaFave in *"Case-by-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma,* 1974 S.Ct.Rev. 127 at 141: "A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be literally impossible of application by the officer in the field."

That lawyers or at least judges "eagerly feed" upon that heady stuff is debatable.

The effort to find the reliable touchstones for all cases is surely doomed to failure because "[s]treet encounters between citizens and police officers are incredibly rich in diversity," *Terry,* 392 U.S. at 13, 88 S.Ct. at 1875, as this case once again demonstrates. This case also demonstrates, as do countless others, that, like the Rule Against Perpetuities, it is one thing to put the rules of search and seizure in a nutshell. It is quite another thing to keep them there.

The events immediately preceding and attendant upon the stopping of the moving ice cream truck were succinctly described by DEA Agent Masiello. Two dark-skinned black males, sloppily dressed, had exited an apartment building and entered a Jack and Jill ice cream truck. After the truck had proceeded to leave the area and travelled approximately fifteen to twenty yards, Agent Masiello and his partner waved their arms in front of the truck at which point it stopped. He and his partner approached the driver's side of the vehicle and Masiello identified himself as a DEA agent. Two other agents immediately thereafter approached the vehicle from the rear and appeared at the passenger side. The only reasons for which the defendants were stopped were because the truck was in front of a designated address and Agent Masiello believed they were "Africans as opposed to American blacks."

"The question is whether it is an unreasonable seizure under the Fourth ... Amendment[ ] to stop an automobile, being driven on a public highway, for the purpose of checking the driving license of the operator and the registration of the car, where there is neither probable cause to believe

---

is obtained, place of birth, included (sic) country of origin.

THE COURT: Is there a Second Circuit case on this?

MR. DE VITA: Yes, there is. You don't need to give Miranda Rights for information obtained on processing.

THE COURT: Then I will follow that case, that's my recollection of the law in terms of pedigree, Miranda Rights are not necessary. No written order of suppression, distinct from the suppression hearing, was entered, and the parties on appeal have treated Judge Korman's original *Miranda* ruling as surviving the latter

quoted colloquy. However dubious that interpretation of the record, we have addressed the issue in those terms to avoid any loose ends on remand.

7. Actually, it is the concurring opinions of Justices Powell and White in *United States v. Crews,* 445 U.S. at 477, 100 S.Ct. at 1253, in which a majority of the justices joined on the issue relevant here, *see id.* at 479, 100 S.Ct. at 1254, rather than the majority opinion, that support *Arias.*

nor reasonable suspicion that the car is being driven contrary to the laws governing the operation of motor vehicles or that either the car or any of its occupants is subject to seizure or detention in connection with the violation of any other applicable law." That question, put by the court in *Delaware v. Prouse,* 440 U.S. 648, 650, 99 S.Ct. 1391, 1394, 59 L.Ed.2d 660 (1979), is essentially the question here.

The answer to that question can be found in several pronouncements in the course of the opinion in that case:

> The Fourth ... Amendment[ ] [is] implicated in this case because stopping an automobile and detaining its occupants constitute a "seizure" within the meaning of [that] Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.
>
> \* \* \* \* \* \*
>
> An individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation. Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities. Many people spend more hours each day traveling in cars than walking on the streets. Undoubtedly, many find a greater sense of security and privacy in traveling in an automobile than they do in exposing themselves by pedestrian or other modes of travel. Were the individual subject to unfettered governmental intrusion every time he entered an automobile, the security guaranteed by the Fourth Amendment would be seriously circumscribed. As *Terry v. Ohio* ... recognized, people are not shorn of all Fourth Amendment protection when they step from their homes onto the public sidewalks. Nor are they shorn of those interests when they step from the sidewalks into their automobiles.

440 U.S. at 653, 662–63, 99 S.Ct. at 1400–01.

*United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), upon which the majority places considerable emphasis in support of their conclusion, is factually distinguishable in a significant respect. Sylvia Mendenhall was approached by two federal agents who identified themselves as such as she was walking through the Detroit Metropolitan Airport upon arriving on a flight from Los Angeles. She was asked to show her identification and airline ticket which she furnished. In deciding that what had transpired to that point was not a seizure, the Court said that a seizure occurs only when an officer "by means of physical force or show of authority, has in some way restrained the liberty of a citizen," 446 U.S. at 552, 100 S.Ct. at 1876, and nothing in the record suggests that Ms. Mendenhall "had any objective reason to believe that she was not free to end the conversation ... and proceed on her way, and for that reason we conclude that the agents' initial approach to her was not a seizure." 446 U.S. at 555, 100 S.Ct. at 1878.

*Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), upon which the majority also relies, is virtually identical, factually, with *Mendenhall.* Relying upon *Mendenhall,* the court reaffirms that:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within

the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

460 U.S. at 497–98, 103 S.Ct. at 1323–24 (citations omitted).

The distinctions between *Mendenhall*, *Royer*, and this case are, to me, plain. To begin with, neither *Mendenhall* nor *Royer* provided a factual occasion for invoking the teaching of *Delaware v. Prouse* that stopping an automobile and detaining its occupants is a seizure within the meaning of the Fourth Amendment. That the Court in *Mendenhall* was aware of the distinction is reflected in its decision at 446 U.S. at 556–57, 100 S.Ct. at 1878–79, as follows:

> Moreover, stopping or diverting an automobile in transit, with the attendant opportunity for a visual inspection of areas of the passenger compartment not otherwise observable, is materially more intrusive than a question put to a passing pedestrian, and the fact that the former amounts to a seizure tells very little about the constitutional status of the latter. See also *Delaware v. Prouse,....*

To the extent that the majority regard *Mendenhall* and *Royer* as dispositive insofar as these cases hold that a seizure occurs when in view of all the circumstances a reasonable person would have believed that he was not free to leave, a threshold requirement not satisfied here, I would also find this case distinguishable. Having been caused to bring this ice cream truck to a stop and immediately surrounded by two federal agents on the driver's side and two federal agents on the passenger side, a reasonable man would presumably have believed that they were not there to buy a dixie cup. I would add that I can discern no legal significance in the fact that the ice cream truck was stopped while moving in a parking lot rather than on a public street.

Assuming then, that the defendants were seized, was there probable cause or even reasonable suspicion to believe that the truck or its occupants were subject to seizure or detention in connection with the violation of any applicable law? Agent Masiello having stated the reasons for the stopping of the defendants to which reference has previously been made, I am driven to conclude that neither probable cause nor reasonable suspicion existed.

The government urges that the district court judge overlooked the crucial fact that the agents had warrants for the arrest of the defendants even if he correctly concluded that the stop of the truck constituted a seizure. The inquiry then shifts to the validity of the warrant. The Fourth Amendment commands that a warrant *particularly describe* the persons to be seized. A determination of whether that command was obeyed here will not be materially assisted by the citation of cases. Rather, it seems to me, a common sense appraisal of the descriptions in the warrants will supply the answer. Those descriptions are: John Doe Number One, also known as "Gbenro"; John Doe Number Two, also known as "Niran." Each John Doe is then described as "a male fluent in Yoruba, a Nigerian dialect, residing at 24 Walden Maple Court, Baltimore, Maryland 21207 and reached at telephone number (301) 485–9597." It is undisputed that both the address and the telephone number were wrong. "The validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to discover and to disclose, to the issuing magistrate." *Maryland v. Garrison*, 480 U.S. 79, 107 S.Ct. 1013, 1018, 94 L.Ed.2d 72 (1987). This information furnished to the magistrate was obtained from a "crisscross directory that was over 15 months old" which could support the conclusion that the duty to discover was not discharged. Agent Masiello learned that the address and telephone number were wrong on May 5 or 6, 1987. That fact was not disclosed to the issuing magistrate until May 8, a day after the arrest was made.

It is also interesting to note that the warrants do not even describe the John Does as being black. The assumption that one must be black to be fluent in Yoruba excludes the possibility of fluency in that dialect by white persons and others. The nicknames aside, the warrants describe males fluent in a Nigerian dialect, hardly a description that can be regarded as more

particularized than would be one of a male fluent in Creole, a French dialect.

In view of the foregoing, the seizure of the defendants can hardly be said to be based upon more than an "inchoate and unparticularized suspicion or 'hunch.'" *Terry v. Ohio*, 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). It may be that the officers had reasonable suspicion once Obalaja showed his license with the middle name that ended in "Niran." By then, however, the suspicion was too late. The critical moment for reasonable suspicion to have been in the minds of the agent was when the ice cream truck was stopped, not thereafter.

It would be an affectation of research to cite authorities for the proposition that the fruits of that poisoned seizure were tainted and were properly suppressed.