UNITED STATES Of America,

v.

Daleon ADAMS, Defendant.

No. 99–CR–176S.

United States District Court,
W.D. New York.

March 22, 2001.

Denise E. O'Donnell, United States Attorney, Paul J. Campana, Assistant United States Attorney, of counsel, Buffalo, New York, for the Government.

William G. Clauss, Federal Public Defender, Joseph B. Mistrett, First Assistant Federal Public Defender, of counsel, Buffalo, New York, for defendant.

## ORDER

SKRETNY, District Judge.

1. On January 20, 2000, Daleon Adams filed an Omnibus Motion including a request to suppress evidence ("Defendant's Motion to Suppress Evidence") (Docket No. 10).

2. On December 7, 1999, this Court issued an Order referring this case to the Honorable Leslie G. Foschio, United States Magistrate Judge, for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

3. On April 20, 2000, Judge Foschio heard oral argument on Defendant's Motion to Suppress Evidence. At this time, Defendant requested a suppression hearing to determine whether his arrest was supported by probable cause.

4. By Report and Recommendation dated May 4, 2000 (Docket No. 15), Judge Foschio recommended that Defendant's Motion to Suppress Evidence and request for a suppression hearing should be denied.

5. On May 19, 2000, Defendant filed Objections (Docket No. 16) to Judge Foschio's May 4, 2000 Report and Recommendation.

6. This Court heard oral argument on the Defendant's objections on September 8, 2000. At this time, this Court decided to recommit the matter to Judge Foschio for further findings.

7. On September 11, 2000, this Court issued an Order (Docket No. 22) denying Defendant's Objections without prejudice as moot, directing the Government to file a supplemental affidavit, and recommitting the matter to Judge Foschio for further findings.

8. After receipt of the parties' supplemental submissions, Judge Foschio issued a Supplemental Report and Recommendation on December 1, 2000 (Docket No. 27). In this Supplemental Report and Recommendation, Judge Foschio again recommended that Defendant's Motion to Suppress Evidence and request for a suppression hearing should be denied.

9. This Court deemed the record complete for purposes of this motion upon receipt of the parties's filed submissions. This Court has carefully reviewed de novo the Report and Recommendation as well as the pleadings and materials submitted by the parties.

IT HEREBY IS ORDERED that this Court accepts the Magistrate Judge Foschio's Supplemental Report and Recommendation of December 1, 2000 in its entirety, including the authorities cited and the reasons given therein.

FURTHER, the portion of Defendant Adams' omnibus motion seeking to suppress evidence is DENIED.

FURTHER, the portion of Defendant Adams' omnibus motion request hearing is DENIED.

SO ORDERED.

## SUPPLEMENTAL REPORT and RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### JURISDICTION

This matter was re-referred to the undersigned by the Hon. William M. Skretny on September 11, 2000. The matter is presently before the court on Defendant's pretrial motion to suppress statements, filed January 6, 2000 (Docket Item No. 10), as supplemented by the parties.

### BACKGROUND

Defendant Daleon Adams, was charged in a criminal complaint on September 24, 1999 with one count of bank robbery in violation of 18 U.S.C. § 2113(a). On January 6, 2000, Defendant filed an omnibus motion (Docket Item No. 10), seeking, *inter alia*, to suppress from evidence statements following the arrest, arguing that his warrantless arrest was not supported by probable cause.[1] The motion is supported by the attached Affirmation of Joseph B. Mistrett, Esq. ("Mistrett Affirmation"). In opposition to the motion, the Government filed on January 20, 2000, the Government's Response to Defendant's Pretrial Motion (Docket Item No. 12) ("Government's Response"). At oral argument on April 20, 2000, Defendant requested the court conduct a suppression hearing to determine whether his arrest was supported by probable cause.

In a Report and Recommendation issued May 4, 2000 (Docket Item No. 15) ("the Report and Recommendation"), the undersigned found Defendant was arrested based on probable cause and, therefore, recommended that Defendant's motion to suppress evidence and, alternatively, requesting a suppression hearing, be denied. On May 19, 2000, Defendant filed objections to the Report and Recommendation arguing that the court erroneously, and without any evidentiary hearing, resolved disputed issues of material fact which resulted in an erroneous finding that Defendant's arrest was based on probable cause.

The Government filed a response (Docket Item No. 18) on June 23, 2000. Defendant's reply (Docket Item No. 20) was filed July 13, 2000. Following oral argument on Defendant's objections to the Report and Recommendation on September 8, 2000, Judge Skretny, in light of previously undisclosed and undisputed factual evidence, re-referred the case to the undersigned for further consideration. Accordingly, Defendant's objections to the Report and Recommendation were denied, without prejudice, as moot. The Government was also directed to file an evidentiary affidavit concerning the new information by September 20, 2000.

On September 20, 2000, the Government filed a Supplemental Response (Docket Item No. 23) ("Government's Supplemental Response"), consisting of the Affidavits of Buffalo Police Detective Sergeant Henry M. Smardz ("Sergeant Smardz Affidavit"), and Federal Bureau of Investigation ("FBI") Special Agent Gary Earl Adams ("Agent Adams Supplemental Affidavit"), with attached exhibits. Defendant's Reply to the Government's Response to Defendant's Motion to Suppress (Docket Item

---

1. Defendant does not dispute he signed a written waiver after administration of his *Miranda* warnings and that no incriminating statements were made by him. Further, at oral argument on April 20, 2000, Defendant withdrew his motion at oral argument insofar as it sought to suppress statements made by Defendant as in violation of *Miranda*.

No. 25) ("Defendant's Reply") was filed on October 11, 2000. The Government's Supplemental Memorandum in Response to Defendant's Motion to Suppress (Docket Item No. 26) ("Government's Supplemental Memorandum") was filed on October 24, 2000.

Based on the following, Defendant's motion to suppress evidence and for a suppression hearing should be DENIED.

## FACTS[2]

To provide a clearer understanding of the facts, the layout of the streets within the vicinity of the Chase Manhattan Bank branch at 295 Main Street in Buffalo ("the Bank") is described in detail. The Bank is located in the Ellicott Square Building which occupies an entire city block delineated on the north by South Division Street, on the east by Washington Street, on the south by Swan Street, and on the west by Main Street. Ellicott Street is located one block to the east of, and runs parallel with, Washington Street and is also parallel with Main Street. Mohawk and Huron Streets are parallel to each other, as well as to Swan Street, with Mohawk Street located approximately three blocks north of South Division Street and Huron Street a block further north.[3] Both Mohawk and Huron Streets intersect with Main, Washington and Ellicott Streets. Broadway radiates northeasterly, beginning at a point on Ellicott Street,

approximately one block south of the intersection of Ellicott and Huron Streets. Grever's Flower Shop is located at 537 Main Street at the corner of Huron Street.

Shortly before 9:10 A.M. on September 24, 1999, the Bank was robbed by a bank robber who entered the bank through the rear entrance on Washington Street. Agent Adams Affidavit, ¶¶ 1–3. Security Officer's Call T. at 6–8.[4] The robber wore tennis shoes, blue jeans and a gray hooded sweatshirt with the hood up, as well as a gray mask with the area around the eyes cut out, and a green camouflage jacket. Agent Adams Affidavit, ¶ 3. Carrying what appeared to be a pistol, the robber vaulted over the bank teller counter, waived the gun at the teller on duty behind the counter and ordered the teller to open the drawer. Id., ¶ 4; Security Officer's Call T. at 6–8. The robber then scooped the money out of the drawer and into a white plastic bag, vaulted back over the counter and ran toward the back or Washington Street exit. Agent Adams Affidavit, ¶ 4. As the robber left the Bank through the back exit, he shed the jacket and mask he had been wearing, leaving them in the Bank's vestibule along with the gun, later determined to be a pellet gun. Id.; Security Officer's Call T. at 10.

A witness walking along Washington Street ("the witness") observed a man from behind wearing blue jeans, a gray hooded sweatshirt and a dark backpack

---

2. The fact statement is taken from the Complaint, Sergeant Smardz Affidavit and Agent Adams Supplemental Affidavit. The Complaint charging Defendant with violating 18 U.S.C. § 2113(a) is supported by the Affidavit of FBI Special Agent Gary Earl Adams ("Agent Adams Affidavit").

3. Although South Division Street borders the Ellicott Square Building to the north, it is not parallel with Swan Street which borders the Ellicott Square Building to the south as South Division Street runs at a slight diagonal from

the southeast to the northwest, forming a "Y" with North Division Street at its intersection with Main Street. Accordingly, South Division Street also is not parallel with Mohawk and Huron Streets.

4. The transcript of the Bank's security officer's 911 call ("Security Officer's Call T.") begins at p. 6 of Exhibit A of Agent Adams Supplemental Affidavit. Defendant does not dispute the accuracy of these records.

emerge from the bank onto Washington Street, mount an adult sized bicycle and ride north up Washington Street, turn east onto North Division Street and cross kitty-corner to the Niagara Frontier Transportation Authority bus station ("the bus station") located at the intersection of North Division and Ellicott Street. Adams Affidavit, ¶ 5; Witness Call T. at 2–3.[5] The robber was further described in the robbery report called in by the witness to the Buffalo Police as a younger black male, approximately 5 feet, 6 inches tall. Agent Adams Affidavit, ¶ 5; Witness Call T. at 3–4. He was not able to describe the robber's face as the robber wore a mask and the hood of his sweatshirt was pulled up. Witness Call T. at 4–5. According to the witness, the robber left the handgun and a shirt in the doorway at the Ellicott Street entrance to the Bank. *Id.* at 4. The witness reported that as he was walking by the Bank, he observed the robber in the doorway looking "frantic." *Id.* at 5.

At 9:10 A.M. on September 24, 1999, another emergency 911 call was placed by a security officer with the Bank. Security Officer's Call T. at 6. The security officer had witnessed the robbery and described the robber at a male, about 5′ 4″ or 5′ 5″ tall, wearing a gray face mask with a sweatshirt pulled over his head and displaying a black handgun. *Id.* at 6–7, 10. The robber was further described as weighing approximately 180 lbs. and "very agile 'cause he jumped over the counter and the counter's about 4 foot high." *Id.* at 11. The robber exited through the back entrance. *Id.* at 7, 10.

According to a contemporaneous police vehicle radio transmission received at 9:10 A.M., a suspect, who was described as a black male wearing a gray sweatshirt and jeans, carrying a knapsack and riding a bicycle on North Division and Washington Streets was observed by police officers in the vicinity. Radio Transmission T. at 15, 16 [6], Agent Adams Affidavit, ¶ 6. The officers approached the man and said, "Hey you on the bike." Agent Adams Affidavit, ¶ 6. The bicyclist then fled the officers who gave chase. *Id.*

One of the officers reported the suspect, wearing a red hooded sweatshirt, was riding on Mohawk back toward Washington Street with the other officer giving chase on foot. Radio Transmission T. at 17. The suspect abandoned his bicycle and ran over Mohawk Street toward Main Street, then turned and ran north on Main Street, and was apprehended at 9:13 A.M. at the corner of Main and Huron Streets. Radio Transmission T. at 17; Agent Adams Affidavit, ¶ 6. The suspect did not have the backpack with him when he was apprehended; rather, the backpack was found at approximately 9:17 A.M. by the police in the doorway of Grever's Flower Shop located at 537 Main Street, which is at the corner of Main and Huron Streets, in the direction from which the bicyclist had run. Radio Transmission T. at 19; Agent Adams Affidavit, ¶ 7. Defendant was transported by the police to the Bank for identification. Radio Transmission T. at 18, 21. Defendant remained at the Bank with the police until 9:55 A.M. when he was transported to central booking. Radio Transmission T. at 27.

**5.** A "911" emergency call placed by the witness to the Buffalo Police Department is reported as being received at 9:09:43 A.M. A copy of the transcript of the witness's 911 call to the Buffalo Police ("Witness Call T.") is attached as Exhibit A to Agent Adams Supplemental Affidavit.

**6.** "Radio Transmission T" references are to the page of Exhibit A of Agent Adams Supplemental Affidavit which is comprised of a copy of the transcript of the police radio transmission.

Sergeant Smardz was called upon to investigate three scenes in connection with the bank robbery, including the Ellicott Square Building, Grever's Flower Shop where a backpack had been discovered and the intersection of Mohawk and Ellicott where the bicycle had been discarded. Sergeant Smardz Affidavit, ¶ 1. Upon arriving at the Bank at 9:40 A.M., Sergeant Smardz observed partial lifts of footwear on the counter of a tellers station. *Id.,* ¶ 2. Sergeant Smardz then proceeded to Grever's Flower Shop arriving at 10:00 A.M., where he observed the backpack in the vestibule of the shop. *Id.* ¶ 3. The backpack, however, was not opened until 10:26 A.M. when the photographer with the police evidence unit arrived to photograph the evidence. Radio Transmission T. at 29; Sergeant Smardz Affidavit, ¶ 3; Agent Adams Supplemental Affidavit, ¶¶ 7–8. According to Sergeant Smardz, it is standard police practice not to disturb items of evidence of any crime until the area where the evidence is discovered has been photographed by a police photographer. Sergeant Smardz Affidavit, ¶ 5. After the backpack was photographed, Sergeant Smardz opened it. Sergeant Smardz Affidavit, ¶ 4. Inside the backpack were a gray hooded sweatshirt, duct tape and a white plastic bag containing a then undetermined amount of money. Agent Adams Affidavit, ¶ 7; Agent Adams Supplemental Affidavit, ¶ 10; Sergeant Smardz Affidavit, ¶ 4. The bicycle was found at Mohawk and Ellicott Streets. Radio Transmission T. at 19, 21; Agent Adams Affidavit, ¶ 7.

The amount of money stolen from the bank was reported as $5,395. Agent Adams Affidavit, ¶ 8. The man apprehended on suspicion of committing the bank robbery was identified as Daleon

Adams, a black male, age 22, who is approximately 5 feet, nine inches tall. *Id.,* ¶ 9.

Agent Adams interviewed Defendant at the Buffalo Division of the FBI on September 24, 1999 at 12:00 noon. Agent Adams Supplemental Affidavit, ¶ 9. Prior to the interview, Agent Adams advised Defendant of his *Miranda* rights and obtained a written waiver of those rights.[7] *Id.* During the interview, Defendant admitted that he was the individual whom the police had chased, but explained that he took off on the bicycle after being approached by the police officers because he believed that the bicycle he was riding was stolen. Report of Defendant's Interview at 1.[8] Defendant maintained he purchased the bicycle for $25 from an individual whom he refused to identify. *Id.* at 1–2. Agent Adams also showed Defendant a pair of red and white sneakers which Defendant admitted he was wearing when he was chased by the police. *Id.* at 2. In response to further questioning, Defendant denied knowledge as to why there was gray duct tape on the right sneaker. *Id.*

### DISCUSSION

Defendant asserts that he was arrested without probable cause and seeks to suppress evidence on the basis that such evidence tainted by the illegality of his arrest. Defendants' Reply at 2. In particular, Defendant challenges the general description radioed to the police in light of the bank surveillance tape and interview with the victim bank teller who described the bank robber as wearing tennis shoes, blue jeans, a gray hooded sweatshirt with the hood up, a gray mask and a green camouflage jack-

---

7. A copy of Defendant's written waiver of his Miranda rights is attached as Exhibit C to Agent Adams Supplemental Affidavit.

8. A copy of the FBI's Report of Defendant's Interview is attached as Exhibit B to Agent Adams Supplemental Affidavit.

et, as well as the witness's description of a man wearing blue jeans, a gray hooded sweatshirt and a dark backpack who, after exiting the bank, mounted an adult size bicycle and rode north on Washington Street. Mistrett Affirmation, ¶¶ 35, 37. Defendant maintains that the general description of the bank robber given to the arresting police officers, *i.e.*, a black male approximately 5 feet, 6 inches and riding a bicycle, was insufficient to support probable cause for the arrest, *id.*, ¶¶ 38–42, and that there is no mention in the Complaint that any police officer saw the Defendant wearing a backpack. Defendant's Reply at 4–8. Defendant also argues that as the backpack located in the vestibule of Grever's Flower Shop was not opened and its contents therefore not disclosed until 10:30 A.M., its contents cannot establish probable cause to justify his arrest some 75 minutes earlier. Defendant's Reply at 5–7. Defendant further argues that without knowledge of the backpack's contents, the only evidence tying Defendant to the bank robbery are the "limited description of the bank robber as a black male riding a bicycle, and the fact that [Defendant] fled upon encountering police officers." *Id.* at 8. According to Defendant, that he later was advised of and waived his *Miranda* rights does not purge his statement of the taint of the illegal arrest because he was never released from custody in the interim. *Id.* at 9–10. Accordingly, Defendant seeks to suppress his statement and all physical evidence seized from him, including his sneakers. *Id.* at 10.

According to the Government, the arrest was based on probable cause. Government's Supplemental Memorandum at 5–9. Specifically, the Government maintains that under a common sense approach to what constitutes probable cause, the scenario under which Defendant was arrested demonstrates that the police encounter with Defendant developed from a consensual encounter to an investigative *Terry* stop based on reasonable suspicion that Defendant was the bank robber, to probable cause that supported Defendant's arrest. Government's Response at 4–6; Government's Supplemental Memorandum at 11–12. As such, the Government maintains Defendant's arrest was valid and, as such, there is no basis on which to suppress Defendant's statements as fruits of an illegal arrest. *Id.*

■ Upon consideration of the record, as supplemented by the affidavits of Sergeant Smardz and Agent Adams with their attached exhibits, the court finds that even if Defendant's arrest, when apprehended at 9:13 A.M., was not valid, the discovery of the backpack and its contents at 10:26 A.M. sufficiently established probable cause to support Defendant's arrest by the time Defendant was interviewed by Agent Adams at noon. Such probable cause, in combination with Defendant's waiver of his *Miranda* rights purged any conceivable taint from Defendant's initial apprehension, even if considered as an initial illegality.

As discussed in the original Report and Recommendation, there are three types of encounters between a law enforcement agent and an individual. Report and Recommendation at 4–5. The first is a consensual encounter where the individual agrees to speak with law enforcement personnel. *United States v. Hooper*, 935 F.2d 484, 490 (2d Cir.), *cert. denied*, 502 U.S. 1015, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991). It is not a seizure and, thus, does not implicate the Fourth Amendment. *United States v. Glover*, 957 F.2d 1004, 1008 (2d. Cir.1992). The second, known as a *"Terry"* stop, is a limited investigatory stop based on "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v.*

*Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The third is a seizure or arrest based on probable cause that an offense has been or is being committed by the person seized. *United States v. Cruz,* 834 F.2d 47, 50 (2d Cir., 1987). Fourth Amendment protections directly attach to the third type of encounter. *Glover, supra,* at 1008.

■ The record in this case demonstrates that the police officer's first attempted a consensual encounter with Defendant when they approached him and said, "Hey you on the bike." As such an encounter did not constituted a seizure, it did not trigger the Fourth Amendment and required neither reasonable suspicion that criminality was afoot, nor probable cause that a crime had been or was being committed by Defendant. *United States v. Adegbite,* 846 F.2d 834, 837 (2d Cir.1988) (citing *Terry, supra,* at 19, n. 6, 88 S.Ct. 1868). The record also demonstrates that Defendant's subsequent flight from the encounter on his bicycle created reasonable suspicion that criminality was afoot, which supported a limited investigatory stop pursuant to *Terry, supra. Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). In *Wardlow,* the Supreme Court, observing that "[h]eadlong flight—wherever it occurs, is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such," held that an individual's unprovoked flight upon noticing the presence of law enforcement officers, in an area known for heavy narcotics trafficking, supported reasonable suspicion that the individual was involved in criminal activity and justified a limited investigatory stop as

"nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow,* 120 S.Ct. at 676. The Court added that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Id.* Even conduct that is, by itself, lawful or ambiguous and susceptible of an innocent explanation may, under certain circumstances, justify a *Terry* stop. *Id.* at 677.

■ In the instant case, it is undisputed that Defendant fled when the police officers approached Defendant and called out "Hey you on the bike." Defendant matched the general description of the bank robber insofar as the robber was described as a black male riding a bicycle.[9] Defendant was also observed riding the bicycle in the vicinity of the intersection of Broadway and Ellicott Street, which is one block east of Washington Street, and approximately three blocks north of the robbed Chase Manhattan Bank branch. Defendant later dismounted and abandoned the bicycle and fled on foot, both facts consistent with the witness's description. A commonsense, interpretation of the circumstances of such flight by a black male riding a bicycle within a few blocks of a bank which had, only moments before, been reported as robbed by a black male who fled the scene on a bicycle heading in the direction where the Defendant was spotted by the police, support the police officers' reasonable suspicion that Defendant may be the bank robber. *Wardlow, supra,* at 676–77. Accordingly, the police had reasonable suspicion to conduct an investigatory stop of Defendant pursuant to *Terry, supra.*

9. Although the robber was described as 5 feet, 6 inches tall and Defendant is 5 feet, 9 inches tall, the fact that Defendant was seated on the bicycle when he was spotted by the police officers would make it more difficult to estimate his height.

Nor is there any merit to Defendant's contention that the absence in the Complaint of a reference to any police officer who observed Defendant wearing or carrying a backpack while they chased him indicates that no police officer observed Defendant in possession of a backpack. Rather, that the police officers who chased Defendant observed that he had a backpack with him can be gleaned from the transcript of the contemporaneous radio transmission. Specifically, at 9:10 A.M., the following description was transmitted over the police radio:

Alright I got a suspect that's a black male wearing a gray sweatshirt and jeans he's riding a bike *he's got a knap sack last seen through the park on North Division and Washington.*

Radio Transmission T. at 16 (*sic*) (emphasis added).

Three minutes later, at 9:13 A.M., the following description was transmitted over the police radio:

They got a suspect as a black male ah wearing a gray sweatshirt jeans ah he was riding a bike.... *Had a knap sack* and ah he was also had a mask on his face. He left his gun at the bank, ah he was last seen going through the park on North Division and Washington. So that, that's be a lot cops looking around.

Radio Transmission T. at 15 (*sic*) (emphasis added).

A police officer responded to the first description: "(unintelligible) suspect ... don't get a head of him he'll go the other way." Radio Transmission T. at 16 (*sic*). According to the ensuing radio transmissions, the police officers did not thereafter lose sight of Defendant, then wearing a red hooded sweatshirt, and apprehended him at 9:13 A.M. Radio Transmission T. at 17. At 9:14 A.M., with Defendant in custody, the police radioed that, "[Defendant's] bicycle is at Ellicott and Mohawk. Some-

body go back and get it *he's got a knap sack to.*" Radio Transmission T. at 18 (*sic*) (emphasis added). The knap sack was then located at Huron and Main Streets. *Id.* at 19. The police radio recording of the events comprising the police chase, as they unfolded, demonstrates that the police officers observed Defendant with the back pack, as described by the witness, in his possession throughout the chase until he abandoned it just prior to being apprehended.

■ However, whether the reasonable suspicion which justified an limited investigatory stop of Defendant later developed into probable cause sufficient to justify a warrantless arrest of Defendant is not as clear. A warrantless arrest is justified when there is "probable cause when the defendant is put under arrest to believe that an offence has been or is being committed." *United States v. Cruz*, 834 F.2d 47, 50 (2d Cir.1987). In determining whether probable cause existed for a warrantless arrest, the court should consider the "totality of circumstances" and view the issue as a common sense, practical determination. *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see United States ex rel. Gonzales v. Follette*, 397 F.2d 232, 235 (2d Cir.1968) (holding common sense should be used in resolving issue of probable cause for arrest without warrant). Probable cause exists "if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense had been or is being committed." *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir.1990); *see also Illinois v. Gates*, 462 U.S. 213, 230, 103 S.Ct. 2317 (1983) ("totality of the circumstances"); *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) ("common sense

standard" such that evidence "must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement") (internal citation omitted). "Moreover, the existence of probable cause is not defeated even where it is based upon mistaken information so long as the arresting officer was reasonable in relying upon the information." *Mroz v. City of Tonawanda,* 999 F.Supp. 436, 462 (W.D.N.Y.1998) (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994)). *See also Marshall v. Sullivan,* 105 F.3d 47, 53 (2d Cir.1996).

The facts presented to the court when it issued the original Report and Recommendation indicated that the backpack was opened shortly after it was found several feet from where Defendant was apprehended. The court found that the backpack's contents, including the money and the gray sweatshirt, sufficiently tied Defendant to the bank robbery and, thus, provided sufficient probable cause to support a warrantless arrest of Defendant at that point. The court has since learned that the backpack was not opened, and its contents thus not discovered, until some 75 minutes had elapsed from Defendant's apprehension. As such, the contents of the backpack cannot establish probable cause justifying Defendant's arrest upon his apprehension immediately following the police chase.

The Government, however, maintains that Defendant was subjected to only a limited investigatory stop pending the arrival of the police evidence unit to photograph the scene where the backpack lay abandoned and the subsequent opening of the backpack. Government's Supplemental Memorandum at 12–14. In support of its argument, the Government relies on *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), *Hooper, supra,* and *United States v. Sterling,* 909 F.2d 1078 (7th Cir.1990). However, those cases are inapposite to the instant case because at issue in each of those cases was the detention of a piece of luggage belonging to the defendants who were free to leave. *Place, supra,* at 699, 709–10, 103 S.Ct. 2637; *Hooper, supra,* at 494–95; *Sterling, supra,* at 1080–81, 1083–84. In the instant case, given that Defendant was transported by the police to the scene of the bank robbery, the logical inference is that Defendant was not free to leave but, rather, was under arrest before the backpack was opened and its contents discovered.[10]

Nevertheless, the Government further maintains that once the backpack was opened and its contents discovered, sufficient probable cause to support Defendant's arrest existed and removed the taint of any illegality posed by Defendant's arrest. Government's Supplemental Memorandum at 12. Defendant argues in contrast that the taint of the illegal arrest was not purged by giving Defendant the *Miranda* warnings and obtaining Defendant's waiver of such rights. Defendant's Reply at 9–10.

In *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Supreme Court held that verbal evidence indirectly obtained through a Fourth Amendment violation may be excluded from evidence as "fruit of the poisonous tree," yet cautioned that

---

**10.** The search of the backpack did not violate the Fourth Amendment as it was abandoned. *Gudema v. Nassau County,* 163 F.3d 717, 722 (2d Cir.1998) ("even in the absence of a warrant and probable cause, a search of property that has been abandoned, for example, does not violate a privacy interest [under the Fourth Amendment]") (citing *United States v. Torres,* 949 F.2d 606, 608 (2d Cir.1991) (no expectation of privacy in shoulder bag where defendant disclaimed ownership of bag and knowledge of its contents)).

We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of primary taint.'

*Wong Sun, supra,* at 487–88, 83 S.Ct. 407 (quoting MAGUIRE, EVIDENCE OF GUILT 221 (1959)).

Further, the Second Circuit has held that whether a statement has been purged of such a taint (based on a Fourth Amendment violation) does not hinge on a simple 'but for' analysis, but rather, 'must be answered on the facts of each case.' Relevant factors include whether a Miranda warning has been given and waiver obtained, the temporal proximity of the illegal seizure and the contested statement, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct.

*United States v. Thompson,* 35 F.3d 100, 105 (2d Cir.1994) (quoting and citing *Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

In the instant case, the record demonstrates that even assuming, *arguendo,* that Defendant was arrested without probable cause and, thus, in violation of the Fourth Amendment, the statement Defendant made to Agent Adams, and the seizure of his sneakers as evidence were, nevertheless, purged from the taint of such illegality. Specifically, the backpack containing the money stolen from the bank, the gray sweatshirt and duct tape was found several feet away from Defendant immediately following his arrest. The 75 minute delay between Defendant's arrest and the opening of the backpack cannot be attributable to "flagrant official misconduct," but, rather, to the customary requirement that the police await for the arrival of a police evidence unit to photograph the backpack before opening it. Once the backpack was photographed and opened, its contents sufficiently connected Defendant to the bank robbery such that probable cause for his arrest existed. As Defendant was not interviewed by Agent Adams until noon, although probable cause existed for Defendant's arrest at least an hour and a half earlier after the backpack was opened. Further, Defendant was given the *Miranda* warning and executed a waiver of those rights in writing, a fact which Defendant does not dispute. Nor does Defendant argue that the waiver of his rights was anything other that knowingly and voluntary. Under these circumstances, the court finds that even if Defendant's initial arrest was not based on probable cause, there is no basis on which to suppress evidence obtained subsequent to such arrest, including the sneakers he wore when he was apprehended and the statements he made to Agent Adams, as the intervening circumstances purged any taint attributed to such illegality.

Even if Defendant seeks to suppress any statements made at the time of the arrest as fruit of an illegal arrest, he has failed to identify such statements and the Government maintains that the only statement made by Defendant was a denial that he committed the bank robbery. Government's Response at 5. Further, Defendant has not challenged the search of the physical evidence, has withdrawn his motion to suppress statements made upon his arrest as made without benefit of the *Miranda* warnings, and has not filed an affidavit challenging the sequence of events as related by the witness and police officers involved so as to establish the existence of a disputed issue of material fact. As such,

Defendant has failed to raise any factual issues sufficient to require an evidentiary hearing on the salient facts surrounding either the statement he gave upon being interviewed by Agent Adams, or the sneakers he admits having worn while he was chased by the police. *See United States v. Pena,* 961 F.2d 333, 336–38 (2d Cir.1992) (defendant's affidavit establishing existence of material issue of fact as to whether search of automobile implicated defendant's Fourth Amendment rights sufficient to support need for evidentiary hearing); *United States v. United States Currency in the Amount of $228,536.00,* 895 F.2d 908, 918 (2d Cir.1990) (holding substantial undisputed evidence supporting probable cause for search and eavesdropping warrants negated need for evidentiary hearing); compare *United States v. Mathurin,* 148 F.3d 68, 69 (2d Cir.1998) ("An assertion that *Miranda* warnings were not given, when the government asserts the contrary, thus creates a specific factual dispute ... [which] cannot properly be resolved without an evidentiary hearing."). Accordingly, there is no need to conduct a hearing to determine whether the arrest was based on probable cause or whether statements made by Defendant following his arrest and the seizure of his sneakers are the fruit of police illegality.

## *CONCLUSION*

Based on the foregoing, Defendant's motion for the court to hold a hearing to determine whether Defendant's arrest was supported by probable cause and to suppress evidence (Docket Item No. 10), should be DENIED.

DATED: December 1, 2001
    Buffalo, New York