105 F.3d 47
 William R. MARSHALL, Plaintiff-Appellee,
v.
Cornelius F. SULLIVAN, individually and in his capacity as a
Police Lieutenant, Kevin Khosrowshahi, Thomas Reardon, BFP
New York, Inc., Andrew Preiser, individually and in his
capacity as a Police Officer, Matthew J. Calcutti,
individually and in his capacity as a Police Officer, Mark
Kugler, individually and in his capacity as a Police
Officer, Dennis Dimele, individually and in his capacity as
a Police Officer, Marco Rivera, individually and in his
capacity as a Police Officer, and The Town of Greenburgh,
New York, Defendants,
Cornelius F. Sullivan, individually and in his capacity as a
Police Lieutenant, and the Town of Greenburgh, New
York, Defendants-Appellants.
 Nos. 93, 94, Dockets 95-9286, 95-9288.
 United States Court of Appeals,
Second Circuit.
 Argued Aug. 28, 1996.
Decided Oct. 17, 1996.
 
 Craig T. Dickinson (Jonathan Lovett, Lovett & Gould, White Plains, NY, on the brief), for Plaintiff-Appellee.
 Thomas J. Troetti, Elmsford, NY, for Defendant-Appellant Sullivan.
 Frederick W. Turner, Elmsford, NY (David R. Fried, Deputy Town Attorney, Elmsford, NY, on the brief), for Defendant-Appellant Town of Greenburgh.
 Before: MESKILL, KEARSE, and MAHONEY, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Town of Greenburgh, New York (the "Town" or "Greenburgh"), and Cornelius F. Sullivan, who at the pertinent times was a Town police lieutenant, appeal from so much of an order entered in the United States District Court for the Southern District of New York, Charles L. Brieant, Judge, as denied their motions for summary dismissal of the claims of plaintiff William R. Marshall seeking damages from them under 42 U.S.C. § 1983 (1994) and state law for false arrest and malicious prosecution. Sullivan and the Town moved for summary judgment principally on the ground that Sullivan had had probable cause to arrest Marshall; Sullivan sought summary judgment on the alternative ground that he was entitled to qualified immunity. The district court denied their motions on the ground that there were genuine issues of fact to be tried as to the existence of probable cause, the reasonableness of any belief on the part of Sullivan as to the existence of probable cause, and the culpability of the Town for the conduct of Sullivan. Appellants seek to challenge these rulings on appeal. For the reasons that follow, we dismiss both appeals for lack of appellate jurisdiction.
 
 I. BACKGROUND
 
 2
 The events giving rise to the present litigation began with a verbal altercation between Marshall and defendant Kevin Khosrowshahi, the owner of a Greenburgh nightclub called "Colours." Most of the events are not in dispute; the contents of certain important conversations are sharply disputed.
 
 A. The Undisputed Events
 
 3
 On the night of Friday, November 6, 1992, Marshall, who was employed as a corrections officer by the Westchester County Department of Corrections, went with a companion to Colours. Christian Binnie, a fellow corrections officer, worked at Colours during the evenings as a "bouncer." Marshall asked Binnie to direct him to someone at Colours to whom Marshall could speak about getting a job as a bouncer; Binnie referred Marshall to Khosrowshahi. Marshall conversed with Khosrowshahi near the club's dance floor, against a background of loud music. Marshall and Khosrowshahi disagree as to some of the content of their conversation, and their differing versions are summarized in Part I.B. below. Both agree, however, that the conversation had acrimonious aspects, with Khosrowshahi later describing his own behavior as "obnoxious" (e.g., Deposition of Khosrowshahi at 25), and Marshall admitting that he threatened to "slap" Khosrowshahi (e.g., Deposition of Marshall at 28). Following the conclusion of the conversation, Marshall left the nightclub.
 
 
 4
 Shortly after Marshall's departure, Khosrowshahi hailed a Town police officer patrolling the area and told him that Marshall had said, inter alia, that, having come into "our territory," Khosrowshahi was going to have problems and that Marshall wanted a share of Khosrowshahi's business. At the officer's suggestion, Khosrowshahi lodged his complaint at the Greenburgh police department on the following Monday, November 9. The detective on duty prepared a detailed "incident report."
 
 
 5
 On the night of November 12, Marshall, accompanied by three companions, returned to Colours. Upon learning of Marshall's arrival, Khosrowshahi instructed the club's manager to call the Greenburgh police. In the meantime, Khosrowshahi spoke with Marshall a second time, outside the presence of Marshall's companions. Marshall apologized for his intemperate behavior at their first meeting and disavowed any intent to take part of Khosrowshahi's business from him. Khosrowshahi said he had enough security staff. The differing versions of the remainder of the conversation are summarized in Part I.B. below. Following the end of the conversation, the two shook hands, and Marshall rejoined his companions.
 
 
 6
 Shortly thereafter, four Greenburgh police officers, including Sullivan, a lieutenant, arrived at Colours in response to the call placed by the club manager after Marshall's arrival. Sullivan and Khosrowshahi conversed for a few minutes alone. Sullivan and the other officers then approached Marshall and his companions and asked to speak with them in the nightclub's office, where it was quieter. When the group, with Khosrowshahi, entered the office, Sullivan asked what had happened and Marshall replied that he was just looking for a job. Sullivan then asked Khosrowshahi whether Marshall or his friends had asked for money or demanded a share of Khosrowshahi's business. Khosrowshahi responded, "No."
 
 
 7
 Sullivan thereupon asked Khosrowshahi to join him outside the office. The two then had a 5-to-8 minute conversation alone. After reentering the nightclub's office, Sullivan directed the officers to place Marshall and his companions under arrest for attempted extortion. Marshall pleaded in vain that they had done nothing wrong.
 
 
 8
 In December 1992, a felony hearing, see N.Y.Crim.Pro.Law §§ 180.10-180.80 (McKinney 1993), was held before the Greenburgh Town Court, which, to the extent pertinent here, ruled that there was sufficient evidence to hold Marshall for the action of a grand jury. In February 1993, Marshall was indicted on four counts of attempted grand larceny in the second degree and two counts of attempted grand larceny in the fourth degree. He moved to dismiss the indictment on the ground that the evidence before the grand jury was insufficient to make out a prima facie case on the charges in the indictment; his motion was denied.
 
 
 9
 Thereafter, Marshall went to trial and was acquitted of all charges.
 
 
 10
 Marshall then commenced the present action against, inter alios, Khosrowshahi, the Town, and Sullivan under § 1983 and state law, seeking damages for false arrest and malicious prosecution. The complaint alleges, inter alia, that Sullivan and Khosrowshahi acted in concert to cause his arrest and prosecution in violation of his Fourth Amendment and state-law rights; it also alleges that Sullivan and Khosrowshahi gave false and materially incomplete testimony at the felony hearing and before the grand jury. Marshall asserts that the Town is liable on the ground that it inadequately trained the arresting officers, including Sullivan, and that it inadequately supervised Sullivan. Eventually all of the defendants moved for summary dismissal of Marshall's claims against them on various grounds. Only the motions of Sullivan and the Town are pertinent to the present appeals.
 
 
 11
 B. The Disputes as to the Contents of the Various Conversations
 
 
 12
 The disputes center principally on what Khosrowshahi told Sullivan just prior to Marshall's arrest, for each of Marshall's claims raises issues of probable cause. Under New York law, a plaintiff claiming false arrest must show, inter alia, that the defendant intentionally confined him without his consent and without being privileged to do so, see, e.g., Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 93, 335 N.E.2d 310, 313-14, cert. denied, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975), and a § 1983 claim for false arrest requires "substantially the same," Posr v. Doherty, 944 F.2d 91, 96 (2d Cir.1991). The existence of probable cause gives an officer the privilege to arrest and "is a complete defense to an action for false arrest." Bernard v. United States, 25 F.3d 98, 102 (2d Cir.1994). To prevail on a malicious prosecution claim under either New York law or § 1983, a plaintiff must show that the defendant maliciously commenced or continued against the plaintiff a criminal proceeding that ended in the plaintiff's favor, and that there was no probable cause for the proceeding. See, e.g., Posr v. Doherty, 944 F.2d at 100. Sullivan moved for summary judgment dismissing the claims against him on the grounds (a) that Khosrowshahi's complaints to the police gave Sullivan probable cause to order Marshall's arrest, and (b) that in any event Sullivan was entitled to qualified immunity because he had an objectively reasonable basis for believing there was probable cause. The Town sought summary judgment in its favor principally on the grounds that probable cause existed and that there was no evidence that any violation of Marshall's rights was the result of a municipal policy. Sullivan and the Town relied in large part on Khosrowshahi's version of his conversations with Marshall.
 
 
 13
 Marshall opposed summary judgment, disputing both the truth of Khosrowshahi's versions of the conversations and the truth of Sullivan's assertions as to Khosrowshahi's statements to Sullivan on the night of the arrest. All of the parties presented the court with evidentiary materials to support their respective positions. These included testimony given before the grand jury that indicted Marshall, testimony at the felony hearing and the criminal trial, testimony at a hearing pursuant to N.Y. General Municipal Law § 50-h (McKinney 1986) ("Section 50-h Hearing") (generally giving municipality the right to question a person who has asserted a claim against it and giving either party the right to introduce the testimony in litigation on the claim), and deposition testimony given in the present case.
 
 
 14
 According to Marshall, on November 6 Khosrowshahi was dressed quite casually, and Marshall repeatedly questioned whether Khosrowshahi was the club's owner, rather than a busboy; when Khosrowshahi became obnoxious in response to Marshall's skepticism, Marshall responded by asking whether Khosrowshahi was "trying to piss me off" (Section 50-h Hearing Transcript at 28), and telling him "to relax before I slap him" (id.). However, Marshall calmed himself enough to explain that he "was just inquiring about a security job" (Deposition of Marshall at 28), and that he "kn[e]w all the troublemakers in the area" (Section 50-h Hearing Transcript at 28), and to state that he would come back some other time (id ). The two then shook hands, and Marshall left Colours.
 
 
 15
 Khosrowshahi painted a more sinister picture. He described Marshall's manner on November 6 as threatening, and he stated that Marshall told him that Khosrowshahi could not "just come in here and open up a business like this in our territory." (Felony Hearing Transcript at 15.) According to Khosrowshahi, Marshall said that Khosrowshahi was "pissing people off" (id.), that Khosrowshahi was "going to have some problems" (id.), and that Marshall wanted a share of Khosrowshahi's business (id. at 21).
 
 
 16
 As to the November 12 conversation, Marshall testified that, after apologizing for his intemperate behavior during the November 6 conversation, he had simply explained again to Khosrowshahi that he sought a job as a security guard. Marshall stated that he had experience in that field, that he knew which persons in the area were "troublemakers," and that Khosrowshahi would not have any problems if Marshall were hired. The conversation ended amicably when Khosrowshahi stated that he already had sufficient security staffing.
 
 
 17
 In contrast, Khosrowshahi claimed that Marshall, though disavowing a demand for part of Khosrowshahi's business, asked for weekly protection payments. According to Khosrowshahi, Marshall stated as follows:
 
 
 18
 [L]et me explain to you how it works. We are going to come in here every week and you are going to pay us and we'll take care of any problems that you have, any fights that you have we'll take care of you and anybody from the club. We'll make sure they don't come back. If you have [a] problem with any wise guys' sons we'll take care of it.
 
 
 19
 (Deposition of Khosrowshahi at 75-76.) Khosrowshahi testified that he responded by noting that he did not owe anything to anyone for his nightclub, that he had an alarm system, insurance, and a full security staff, and that he did not need more.
 
 
 20
 Sullivan testified in his deposition that he was aware of the complaint Khosrowshahi had filed on November 9 at police headquarters and that upon Sullivan's arrival at Colours on November 12 Khosrowshahi described the November 6 and 12 conversations (Khosrowshahi's version) to him. As to Sullivan's private conversation with Khosrowshahi immediately after the latter said that Marshall had not asked for money or demanded a share of his business, Sullivan did not recall asking why Khosrowshahi had answered as he did. (Indeed, at the criminal trial, Sullivan testified that he did not recall that he took Khosrowshahi out for that immediate tete-a-tete.) Sullivan and Khosrowshahi testified at their depositions that Khosrowshahi told Sullivan that Marshall had demanded part of the business on November 6 and had demanded protection payments on November 12.
 
 
 21
 Though Marshall was not party to the private conversation between Sullivan and Khosrowshahi that took place immediately after Khosrowshahi stated to Sullivan that Marshall had not asked for money or a share of Khosrowshahi's business, he presented the deposition of Binnie as to how Khosrowshahi later summarized that conversation to Binnie. Binnie testified that shortly after the arrests, he asked Khosrowshahi what Marshall had been arrested for and whether Marshall or his companions had done or said anything, to which Khosrowshahi responded, " 'No.' " (Deposition of Binnie at 36.) Binnie testified that Khosrowshahi said, " 'The cops made me arrest them. I didn't want to press charges.' " (Id. at 36-37.)
 
 
 22
 In support of his claim that Sullivan and Khosrowshahi had misled the grand jury, Marshall submitted their grand jury testimony which showed that neither man disclosed to that body that on November 12, when asked by Sullivan whether Marshall had asked for money or demanded a share of the business, Khosrowshahi had responded "No."
 
 
 23
 Marshall contended that Sullivan's decision to order the arrests on November 12 was attributable not to any belief that a crime had been committed but rather to Sullivan's resentment of recent reversals in his own career. Marshall testified that at one point on the night of the arrests, while Sullivan was outside of the room, one of the police officers told Marshall, "don't worry about it, this is nonsense," and that "Sullivan [was] in a bad mood; [Marshall] caught him at a bad time." (Deposition of Marshall at 47.) Marshall presented evidence that Sullivan had been demoted from his former position as commanding officer of the Greenburgh police department's detectives division and reassigned to the uniformed patrol division three days before these arrests. Although Sullivan testified that this reassignment was at his own request, his testimony also revealed that he had engaged in a long-running disagreement with the then-recently appointed chief of police, that Sullivan had recently been passed over for a position as captain, and that he felt as if the new "police chief ha[d] clipped [his] wings." (Deposition of Sullivan at 102.) Following the arrests, Sullivan issued a self-aggrandizing press release.
 
 C. The Ruling of the District Court
 
 24
 In a Memorandum and Order dated October 31, 1995 ("District Court Opinion"), the district court denied the motions of Sullivan and Greenburgh for summary judgment on the ground that there were genuine issues of material fact to be tried. Noting that it is not the province of the court on a motion for summary judgment to assess witness credibility or to weigh the proffered evidence, the court found that with respect to the existence of probable cause, as well as Sullivan's entitlement to qualified immunity and the Town's liability for improper supervision of a known-to-be-embittered police officer, Marshall had presented evidence from which a rational jury could infer, inter alia, that Marshall was arrested not because of any reasonable belief by Sullivan that there had been unlawful conduct by Marshall but rather because of improper conduct on the part of Khosrowshahi and Sullivan.
 
 
 25
 With regard to probable cause and the reasonableness of Sullivan's belief, the court stated in part as follows:
 
 
 26
 Mr. Binnie has testified under oath that Khosrowshahi told him ... that "the cops made me arrest them. I didn't want to press charges". (Binnie, May 11, 1995 Dep.Trans., pp. 36-37).
 
 
 27
 ....
 
 
 28
 .... Under the circumstances of this case, in which Khosrowshahi first stated in the presence of the plaintiff and numerous other persons that Mr. Marshall had not asked him for money and later after a private huddle with Lt. Sullivan apparently changed his story and authorized or directed the arrest of Marshall, an adverse inference can be drawn, especially in light of the testimony of Binnie to the effect that Khosrowshahi told Binnie that the police had made him proceed. From this evidence a trier of the facts may infer that an improper agreement was reached between Khosrowshahi and Sullivan. Of course, it is impossible for the Court, on a motion based merely on affidavits, to evaluate the truth of Binnie's testimony upon which this charge is based. Nor can we evaluate Lt. Sullivan's testimony or that of Khosrowshahi as to what if anything took place during the private conversation. These remain disputed issues of fact which must be tried to a jury.
 
 
 29
 District Court Opinion at 5-7.
 
 
 30
 In rejecting the Town's motion, the court noted in part that, taken in the light most favorable to Marshall as the party opposing summary judgment, the evidence showed that
 
 
 31
 Sullivan had just been removed from a command position and had been made to believe that his[ ] "future with the Greenburgh Police Department was not bright" ..., and was sufficiently upset by recent experiences in connection with his law enforcement career to be arguably embittered and depressed....
 
 
 32
 This perception of Sullivan's ability to serve is reinforced by the observations said to have been made by the other officers that "plaintiff and his companions had nothing to worry about and that Sullivan was simply in a bad mood because he had been put back on patrol"....
 
 
 33
 If the situation concerning Lt. Sullivan was as is represented by plaintiff, a reasonable jury may infer that these conditions were known to the Town of Greenburgh through its supervisory officials at a policy making level. Where a municipality places an unfit officer in service and that officer thereafter violates the civil rights of a plaintiff, the municipality may be liable....
 
 
 34
 Id. at 8-9.
 
 II. DISCUSSION
 
 35
 On appeal, Sullivan and the Town seek review of the district court's denial of their motions for summary judgment. For the reasons below, we dismiss both appeals for lack of appellate jurisdiction.
 
 A. The Appeal by Sullivan
 
 36
 The denial of summary judgment is ordinarily an interlocutory decision, not a "final decision" appealable under 28 U.S.C. § 1291 (1994). See, e.g., In re State Police Litigation, 88 F.3d 111, 123-25 (2d Cir.1996); Golino v. City of New Haven, 950 F.2d 864, 868 (2d Cir.1991), cert. denied, 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992). Although the interlocutory rejection of a defense of qualified immunity is sometimes immediately appealable under the "collateral order" doctrine, see Mitchell v. Forsyth, 472 U.S. 511, 524-30, 105 S.Ct. 2806, 2814-18, 86 L.Ed.2d 411 (1985), the rejection of such a defense is not immediately appealable unless the denial presents only " 'a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case.' " Johnson v. Jones, --- U.S. ----, ----, 115 S.Ct. 2151, 2156, 132 L.Ed.2d 238 (1995) (quoting Mitchell v. Forsyth, 472 U.S. at 530 n. 10, 105 S.Ct. at 2817 n. 10); see also Behrens v. Pelletier, --- U.S. ----, ----, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996). Thus, a defendant "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, --- U.S. at ----, 115 S.Ct. at 2159.
 
 
 37
 In general, police officers are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights. See, e.g., Anderson v. Creighton, 483 U.S. 635, 638-41, 107 S.Ct. 3034, 3038-40, 97 L.Ed.2d 523 (1987); Oliveira v. Mayer, 23 F.3d 642, 648 (2d Cir.1994), cert. denied, 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995); see also Golino v. City of New Haven, 950 F.2d at 870. The availability of the defense depends on whether " 'a reasonable officer could have believed' " his action " 'to be lawful, in light of clearly established law and the information [he] possessed.' " Hunter v. Bryant, 502 U.S. 224, 227, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) (per curiam) (quoting Anderson v. Creighton, 483 U.S. at 641, 107 S.Ct. at 3040) (emphasis ours). Qualified immunity does not protect " 'those who knowingly violate the law.' " Hunter v. Bryant, 502 U.S. at 229, 112 S.Ct. at 537 (quoting Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986)).
 
 
 38
 In general, probable cause to arrest exists when an officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime. See, e.g., Dunaway v. New York, 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254, 60 L.Ed.2d 824 (1979); Wong Sun v. United States, 371 U.S. 471, 479, 83 S.Ct. 407, 412-13, 9 L.Ed.2d 441 (1963); Brinegar v. United States, 338 U.S. 160, 175-76, 69 S.Ct. 1302, 1310-11, 93 L.Ed. 1879 (1949); see also Bernard v. United States, 25 F.3d at 102 (probable cause may exist even where the officer has mistaken information, so long as it was reasonable for him to rely on that information). This standard is, and was, well established. But in any given case, the question of whether the standard has been followed must be determined by reference to the "totality of the circumstances," Illinois v. Gates, 462 U.S. 213, 231-33, 103 S.Ct. 2317, 2328-30, 76 L.Ed.2d 527 (1983), on the basis of what information the officer possessed.
 
 
 39
 In the present case, the district court ruled that, as to both the question of whether probable cause existed to arrest Marshall and the question of whether it was reasonable for Sullivan to believe that probable cause existed, there were genuine issues of fact to be tried. The record includes Marshall's innocuous version of his conversations with Khosrowshahi, which is supported by Khosrowshahi's response, in the presence of, inter alios, four policemen, of "No" to Sullivan's question as to whether Marshall had made monetary or proprietary demands; it also includes Khosrowshahi's statement to Binnie that Khosrowshahi had not wanted to have Marshall arrested but had been forced to do so by the police. A jury could infer from this evidence that on November 12, Khosrowshahi realized that Marshall had not in fact been trying to extort money from him and that Sullivan realized that there had been no attempted extortion. If these inferences were drawn, the knowledge possessed by Sullivan would negate both the existence of probable cause to arrest Marshall for attempted extortion and the existence and/or reasonableness of any belief on Sullivan's part that probable cause existed. Since the district court ruled that the existence of probable cause and the availability of qualified immunity depend on the resolution of the factual question as to what Khosrowshahi told Sullivan, the denial of summary judgment is not immediately reviewable.
 
 
 40
 We also conclude that appellate jurisdiction is not conferred on us by reason of Sullivan's contention that probable cause was established as a matter of law because of the principles of New York law that both a grand jury indictment and an order, following a felony hearing, that a suspect be held for the grand jury, create a presumption of probable cause. See generally Gisondi v. Town of Harrison, 72 N.Y.2d 280, 532 N.Y.S.2d 234, 528 N.E.2d 157 (1988). The rationale for the immediate appealability of denials of qualified immunity defenses is that the immunity protects an officer not only from being held liable but also from being required to defend the suit. See generally Mitchell v. Forsyth, 472 U.S. at 526-27, 105 S.Ct. at 2815-16; In re State Police Litigation, 88 F.3d at 123-24. The New York presumption, however, appears not to confer an immunity from suit, but only to help negate the plaintiff's claim on its merits. Thus, the presumption can be upheld after trial without nullifying its intended effect, and its interlocutory rejection is not immediately appealable.
 
 
 41
 Further, even if the presumption conferred an immunity from suit, the denial of summary judgment in the present case would not be immediately appealable for, as the New York Court of Appeals has made clear, the presumption can be overcome by evidence that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith. See Colon v. City of New York, 60 N.Y.2d 78, 82-83, 468 N.Y.S.2d 453, 455-56, 455 N.E.2d 1248, 1249-51 (1983) (indictment); Gisondi v. Town of Harrison, 72 N.Y.2d at 284, 532 N.Y.S.2d at 236, 528 N.E.2d at 158-59 (felony-hearing order). The Gisondi court noted also that there may be extraordinary cases in which the discrepancies between the evidence possessed by the authorities and the evidence presented "are so substantive that failure to disclose them would be comparable to fraud or perjury." Id. at 285, 532 N.Y.S.2d at 237, 528 N.E.2d at 160.
 
 
 42
 In the present case, the evidence, taken in the light most favorable to Marshall as the party opposing summary judgment and with all credibility assessments made in his favor, see, e.g., Fed.R.Civ.P. 56(e) Advisory Committee Note (1963), would support findings that Marshall, merely seeking a job, did not demand money or property from Khosrowshahi; that Khosrowshahi informed Sullivan both that Marshall had not made demands and that Khosrowshahi did not want to press charges; and that Sullivan, improperly motivated by his own recent career failures and demotion, forced Khosrowshahi to press charges solely in order to further Sullivan's own personal goals. A jury could infer that despite knowing that no demands had been made--and therefore that no crime had been committed--Sullivan and Khosrowshahi concealed that fact, as well as the evidence revealing Sullivan's knowledge of that fact, and deliberately misled the felony-hearing court and the grand jury to believe that a crime had been committed. Taken in this light, the decisions of those bodies could reasonably be found to have been the result of conduct comparable to fraud or perjury. As the district court ruled, the decision as to whether to draw the inferences favorable to Marshall and to conclude that there had been an "improper agreement" between Khosrowshahi and Sullivan is within the province of the jury. Thus, the viability of the presumption cannot be determined with reference only to undisputed facts, and the conclusion that there are genuine issues of fact to be tried on that matter is not immediately reviewable.
 
 B. The Appeal by the Town
 
 43
 We also lack jurisdiction of the appeal by the Town. The Town's summary judgment motion was based not on a claim of immunity but on the grounds that Marshall's rights were not in fact violated, and that even if they were, the violation was not the result of a municipal policy. The denial of such a motion can be effectively reviewed on appeal after entry of a final judgment and hence is not immediately appealable. See, e.g., Swint v. Chambers County Commission, 514 U.S. 35, ---- - ----, 115 S.Ct. 1203, 1207-08, 131 L.Ed.2d 60 (1995).
 
 
 44
 The Town's contention that we should exercise pendent jurisdiction over its appeal in conjunction with our consideration of the appeal by Sullivan is moot since we lack jurisdiction over Sullivan's appeal.
 
 CONCLUSION
 
 45
 We have considered all of appellants' arguments in support of appealability and have found them to be without merit. The appeals are dismissed for lack of appellate jurisdiction.