439 F.3d 137
 Frank McCLELLAN, Plaintiff-Appellant,
v.
Steven SMITH, Individually and in His Official Capacity as Police Officer of the City of Rensselaer, Defendant-Appellee,
City of Rensselaer, Defendant.
Docket No. 04-5996-CV.
 United States Court of Appeals, Second Circuit.
 Argued: September 15, 2005.
 Decided: February 24, 2006.
 
 COPYRIGHT MATERIAL OMITTED Lee D. Greenstein, Albany, NY, for Plaintiff-Appellant.
 Gregory S. Mills, Clifton Park, NY, for Defendant-Appellee.
 Before: MINER, WESLEY, Circuit Judges, and RAKOFF, District Judge.[1]
 MINER, Circuit Judge.
 
 
 1
 Plaintiff-appellant Frank McClellan ("McClellan") appeals from a summary judgment and an order denying reconsideration entered in the United States District Court for the Northern District of New York (Hood, J.)[2] in favor of defendant-appellee Steven Smith ("Smith"), a police officer employed by the City of Rensselaer[3] but not on duty at the time of the events giving rise to this action. The action was brought pursuant to 42 U.S.C. § 1983 to redress alleged Fourth Amendment violations related to the arrest and prosecution of McClellan following an altercation involving Smith and McClellan. The violations were pleaded in claims against Smith for false arrest, malicious prosecution, unlawful search and seizure, and unlawful imprisonment. In decisions following cross-motions for summary judgment and a motion by McClellan for reconsideration, the District Court determined that all the Fourth Amendment claims related to the underlying assault charges were barred by the grand jury indictment of plaintiff and that the Fourth Amendment claims derived from the resisting arrest and disorderly conduct charges, as well as the false arrest claim related to the assault charges, were barred in any event by the doctrine of qualified immunity. For the reasons that follow, we vacate the judgment and order of the District Court and remand for further proceedings consistent herewith.
 
 BACKGROUND
 I. The Confrontation and Altercation
 
 2
 The parties give somewhat different versions of the confrontation and ensuing altercation that resulted in McClellan's arrest and prosecution. Because the differences are critical to the disposition of this appeal, we set them forth separately.
 
 A. McClellan's Version
 
 3
 On November 16, 2000, at 7:30 P.M., McClellan was unloading grocery bags from his automobile, which was parked directly in front of his house at 95 Washington Avenue, Rensselaer, New York. He was standing as close as possible to his car while unloading the bags and handing them to his girlfriend, Michelle Cristo, who carried them into the house. At some point in the unloading process, as McClellan was leaning into the driver's side with the door open and his back to Washington Avenue, Smith drove by in the lane where McClellan was parked. As he passed, Smith honked his horn and gestured to McClellan with his middle finger. McClellan returned the gesture, whereupon Smith abruptly turned his car around in a driveway a short distance away and drove back toward McClellan. As McClellan finished unloading and closed his car door, Smith suddenly turned his car into the lane of incoming traffic and stopped at a forty-five degree angle to McClellan's car and only inches away from it. Smith's side-view mirror grazed McClellan's hand, and McClellan was essentially trapped in the triangular area where the two cars met. Witnesses confirmed McClellan's assertion that Smith's car at this point was parked at an angle and blocked oncoming traffic.
 
 
 4
 After he stopped his car, Smith yelled and cursed at McClellan saying: "Who the f____ are you? You just gave me the finger. You know who I am? I am a cop." Although it turned out that Smith was indeed a Detective Sergeant in the City of Rensselaer Police Department, he wore no uniform and his car bore no police markings. He appeared agitated, and his eyes were bloodshot and glassy and he was red-faced. McClellan was concerned that Smith had been drinking. McClellan did not believe, given the circumstances, that Smith was a police officer and requested identification. Smith responded that "he did not have to show . . . any f____ing ID" and attempted to exit his car by pushing the door into McClellan. McClellan, in an effort to avoid a physical confrontation, held Smith's door closed with his hands and body, and advised Smith that he would not let him out until he produced identification. Smith continued trying to push his way out of the car, threatening to "kick [McClellan's] f____ing ass" and to arrest him. During the altercation, McClellan heard Smith use the word "backup" but was not able to see a radio or other police equipment in Smith's car or determine who he was talking to. Eventually, McClellan yelled to Cristo to call the police.
 
 
 5
 Ultimately, Smith was able to push McClellan out of the way with his car door and by punching him in the face. Smith apparently struck his face on the car door as he exited. After wrestling with Smith, and without throwing a punch, McClellan was able to hold Smith down over the hood of McClellan's car. At that point, McClellan noticed that Smith was bleeding profusely from the injury to his face and saw him speak into a hand-held radio and say that he was being beaten (which was not true) and needed backup. McClellan then told Smith that he would release him if he promised to stop fighting. Smith said he would stop, and McClellan released him and walked toward his house. As he did so, Smith grabbed him and told him to wait. McClellan once again asked for identification and once again was rebuffed. The Rensselaer police arrived moments later and Smith directed an officer to arrest McClellan. En route to the police station, McClellan told the police officer that he did not know Smith was a police officer and was only trying to restrain him from getting out of the car in order to avoid a fight.
 
 B. Smith's Version
 
 6
 On November 16, 2000, at about 7:30 P.M., Smith was driving on Washington Avenue in the City of Rensselaer, where he served in the Police Department as a Detective Sergeant. He was wearing street clothes and driving an undercover vehicle with a portable police radio between the two front bucket seats. The radio was at all times receiving transmissions from fellow officers. As he drove, Smith saw a vehicle ahead of him swerve and then saw McClellan in the middle of the road with the door to his car wide open. Perceiving that McClellan was impeding traffic and putting himself in danger of being struck, Smith beeped his horn twice on approaching McClellan. As he passed, Smith saw, in his rear view mirror, McClellan extend his middle finger and shout "F____ you." Smith also observed another car behind him swerve to avoid McClellan.
 
 
 7
 Smith thereupon turned his vehicle around and returned to where McClellan was standing for the purpose of advising him to get out of the road. Smith pulled up alongside McClellan and parked at an angle so that the right side and rear of Smith's vehicle extended into the other lane. The left side of the vehicle was about four feet from McClellan's car and the rear of the vehicle was across the middle of the other lane. As he pulled up alongside, Smith rolled down his driver side window and told McClellan he was a "cop." McClellan replied: "I don't give a f____ who you are." McClellan then started swinging at Smith while Smith was still seated and struck him in the left side of the head. Smith leaned away from McClellan and called for backup on his portable radio.
 
 
 8
 Smith then tried to exit his vehicle and told McClellan he was under arrest. McClellan stood in front of Smith's car door and pushed against it to prevent Smith from exiting his vehicle. Smith finally opened the door and got his left foot out. At that point, McClellan pushed the car door in such a way that the top of the door struck Smith's face, causing a deep facial laceration. Smith was able to exit the car with his portable radio in hand, having used it to call for assistance. McClellan grabbed him and threw him face down across the hood of McClellan's vehicle, holding him in that position with the weight of his body. At that point, other officers arrived at the scene. Smith believed that McClellan was in violation of the Vehicle and Traffic Law when he stood on Washington Avenue with his car door open, impeding traffic and endangering himself.
 
 
 9
 II. The State Charges Against McClellan and their Disposition
 
 
 10
 Immediately following the incident described above, McClellan was charged with four violations of the New York Penal Law: Aggravated Assault on a Police Officer; Assault in the Second Degree; Resisting Arrest; and Disorderly Conduct. He was arraigned before a judge of the Rensselaer City Court on the morning following the incident and held without bail. A preliminary hearing was held four days later in the City Court, which determined that there was reasonable ground to believe that a felony had been committed. On the day following the hearing, the Rensselaer County Court, pursuant to McClellan's application, set bail at $50,000, bond or cash. McClellan posted a bond after having been confined for six days.
 
 
 11
 On February 1, 2001, the case against McClellan was presented to a Rensselaer County Grand Jury. The presentation was conducted by an Assistant District Attorney from Washington County because of a conflict of interest arising from the employment of Smith as a part-time investigator in the office of the Rensselaer County District Attorney. Both McClellan and Cristo testified before the grand jury. The grand jury returned a "No True Bill," and all charges against McClellan were dismissed. Smith reported to the Chief of his Department "[t]hat the Washington County DA's Office presented the case and it was no billed[,] and I wasn't very happy with the District Attorney. I think he was very young and that he was unqualified, not qualified to present it."
 
 
 12
 Smith continued his interest in the case, having, in his supervisory capacity, appointed a new investigator to replace Detective Michael Smith because he "felt that Michael Smith wasn't handling the investigation properly." He instructed the new investigator, Officer Gerald Amedio, to recanvass the neighborhood where the incident occurred. At some point in the continuing investigation, Smith was advised by Assistant District Attorney Mark Loughran of Rensselaer County that the case could be presented to a new grand jury on the basis of new evidence if a judge so ordered.
 
 
 13
 In the search for new evidence, Smith discovered that one Dan Malark, confined to the Rensselaer County Jail, was willing to testify to a purported admission made by McClellan during his confinement in the jail. Smith reported to District Attorney Patricia DeAngelis that Malark would testify in return for a "deal" in his prosecution on a domestic relations charge. DeAngelis refused to bargain with Malark. Eventually, Amedio and Smith came up with the name of Ronald Fordley, another inmate who purportedly had heard McClellan's admission. Another inmate of the County Jail, Larry Fuller, also provided a statement relative to the alleged admission by McClellan. However, it was Fordley's affidavit that constituted the newly discovered evidence that formed the basis for the May 2, 2001, Order of the Rensselaer County Court allowing the case against McClellan to be submitted to a second grand jury.
 
 
 14
 The second grand jury heard the case against McClellan as presented by the Rensselaer County District Attorney's Office, Smith having previously terminated his part-time employment there. McClellan and Cristo again were among those who testified, but this time the grand jury returned an indictment charging McClellan with the following violations of the New York Penal Law: Aggravated Assault on a Police Officer; Assault on a Police Officer; and Assault Second Degree. The jury impaneled in Rensselaer County Court for the trial of the charges contained in the indictment found McClellan "not guilty" on all counts on June 7, 2002. The trial was conducted for the prosecution by the Saratoga County District Attorney, Smith having by the time of trial returned to his employment by the Rensselaer County District Attorney on a full-time basis.
 
 III. Proceedings in the District Court
 
 15
 The action giving rise to the appeal at bar was commenced by the filing of a complaint on September 5, 2002. Invoking the provisions of 42 U.S.C. § 1983, McClellan alleged causes of action against Smith arising out of the above-described incident as follows: False Arrest; Malicious Prosecution; Unlawful Search and Seizure; and Unlawful Imprisonment. Causes of action also were pleaded against the City of Rensselaer for failure to train and failure to supervise. As previously noted, the City of Rensselaer is not a party to this appeal. Issue was joined by the filing of an answer on November 14, 2002. Following disclosure and discovery, Smith filed his motion for summary judgment on June 1, 2004, and McClellan filed his opposition to Smith's motion and his own motion for partial summary judgment on July 12, 2004. Following additional submissions by the parties, the District Court rendered a decision dated September 8, 2004, granting summary judgment to Smith dismissing the complaint and denying McClellan's motion for partial summary judgment with prejudice. McClellan thereafter made a motion for reconsideration, which the District Court denied in a decision dated October 25, 2004.
 
 
 16
 In its decision granting summary judgment, the District Court opined that "[McClellan's] Fourth Amendment claims for false arrest, malicious prosecution, unlawful imprisonment, and unreasonable search and seizure all arise from [McClellan's] allegation that he was arrested without probable cause" and that "the existence of probable cause to arrest would prove fatal to all of [McClellan's] claims." The court noted that New York law provides that indictment by a grand jury establishes a presumption of probable cause for arrest in the absence of a showing of fraud, perjury, suppression of evidence, or other bad faith police conduct. Finding that "[McClellan] has failed to show that variations in [Smith's] testimony resulted from bad faith rather than mere confusion or lapse of memory regarding a fast moving series of events," and further finding that it is "without consequence" that the first grand jury returned a "No True Bill," the District Court concluded that there was a failure to rebut the presumption arising from the second grand jury's finding of probable cause. The court therefore determined that "McClellan's Fourth Amendment claims fail as they relate to these three assault charges."
 
 
 17
 Turning to the charges of resisting arrest and disorderly conduct for which McClellan was originally arrested but never indicted, the District Court observed that the facts surrounding the incident are heavily disputed, that the question of probable cause is predominantly factual, and that the court therefore would not determine whether there was probable cause to arrest McClellan for resisting arrest or for disorderly conduct. However, the court did find that Smith was entitled to qualified immunity on an objective reasonableness standard because a reasonable jury could only conclude that reasonable officers could disagree on the constitutionality of the seizure. The District Court therefore found that "[Smith] is entitled to qualified immunity with respect to the remainder of [McClellan's] Fourth Amendment claims."
 
 
 18
 On reconsideration, the District Court reviewed the three errors that McClellan claimed were made by the District Court in granting summary judgment: that the court misapplied the facts in finding that Smith was entitled to qualified immunity; that the court misapplied the facts and the law in determining that McClellan had failed to rebut the presumption of probable cause created by the grand jury indictment; and that the District Court misapplied the law by holding that the presumption of probable cause arising from the grand jury indictment applies to McClellan's false arrest claim.
 
 
 19
 In rejecting the claim that it misapplied the facts to the issue of qualified immunity, the District Court considered the following facts established:
 
 
 20
 [McClellan] admitted that [Smith] identified himself as a police officer and that [McClellan] heard [Smith] call for backup while outside the police car and say the word "backup" while inside the police car. [McClellan] also admitted to restraining [Smith] by his wrists on top of [McClellan's] car, and although [McClellan] did not witness [McClellan's] car door hit [Smith] in the face, [McClellan] admitted to seriously injuring [Smith].
 
 
 21
 Upon these facts, the court stated "that the only rational conclusion a jury could reach is that reasonable officers would disagree about the legality of [Smith's] conduct" and that therefore "[Smith] was entitled to qualified immunity."
 
 
 22
 As to the grand jury indictment establishing a presumption of probable cause for the arrest, the District Court cited New York Court of Appeals authority for the proposition that the presumption applies only in cases of malicious prosecution but also cited lower court authority for application of the presumption in false arrest cases. The court rejected the claim that the presumption was overcome by "variations" in Smith's grand jury testimony, noting that the variations "all arise from the detailed, fast-moving series of events that occurred" in the course of the altercation. But even if the presumption did not apply to false arrest, according to the District Court, Smith "is entitled to qualified immunity on the false arrest claim as it relates to the three felony assault charges" for the reasons previously given by the court in support of its finding of qualified immunity as grounds for dismissal of all of McClellan's other claims.
 
 DISCUSSION
 I. The Standard of Review
 
 23
 We review a summary judgment determination de novo. See Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 300 (2d Cir.2003). Summary judgment may be granted only where there is no genuine issue as to any material fact and the moving party (Smith in the case at bar) is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c). In ruling on a motion for summary judgment, a court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To grant the motion, the court must determine that there is no genuine issue of material fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine factual issue derives from the "evidence [being] such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. The nonmoving party cannot defeat summary judgment by "simply show[ing] that there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), or by a factual argument based on "conjecture or surmise," Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir.1991). The Supreme Court teaches that "all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); see also Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). It is a settled rule that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.1997). The failure of the District Court to heed this rule caused it to fall into error, as will be seen.
 
 II. Presumption of Probable Cause
 
 24
 At the outset, we identify an error made by the District Court in applying the presumption of probable cause arising from a grand jury indictment. In the opinion of the District Court, as modified in its decision on reconsideration, the grand jury indictment of McClellan on felony assault charges demonstrated probable cause for his arrest on those charges. Because liability for the torts of false arrest, unlawful imprisonment, and unreasonable search and seizure under New York law give rise to liability under 42 U.S.C. § 1983 (as does the New York tort of malicious prosecution), see Cook v. Sheldon, 41 F.3d 73, 77-79 (2d Cir.1994), we look to New York law to determine whether a presumption of probable cause arising from a grand jury indictment can be a defense to these claims, see Savino v. City of New York, 331 F.3d 63, 75 (2d Cir.2003).
 
 As in Savino, the District Court here
 
 25
 analyzed [the] malicious prosecution and false arrest claims together because it believed that the presumption of probable cause arising from [the] indictment was applicable to both claims . . . . But the New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment "applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions."
 
 
 26
 Id. (quoting Broughton v. State, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (N.Y.1975)) (alteration in Savino)(internal citation omitted).
 
 
 27
 Although the District Court, in dismissing the false arrest, unlawful imprisonment, and unreasonable search and seizure claims, erred in applying what it considered to be an unrebutted presumption of probable cause arising from the grand jury's indictment of Smith, the court did not err in applying the presumption to the malicious prosecution claim. The court's error as to that claim lies elsewhere, as will be seen.
 
 
 28
 III. Overcoming the Presumption of Probable Cause
 
 
 29
 The absence of probable cause is an essential element of a claim for malicious prosecution. See Colon v. City of New York, 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983). Although a grand jury indictment gives rise to a presumption that probable cause exists and a claim for malicious prosecution in relation to the crimes described in the indictment thereby is defeated, it should be noted that the presumption may be rebutted by evidence of various wrongful acts on the part of police: "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." Id. at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248.
 
 
 30
 In Boyd v. City of New York, 336 F.3d 72 (2d Cir.2003), we were confronted with a malicious prosecution claim by one who had been indicted by a grand jury for criminal possession of stolen property and unauthorized use of a motor vehicle. Boyd, 336 F.3d at 74-75. The charges had been dismissed on a finding that statements regarding the purchase of the vehicle were made while in police custody and prior to the giving of Miranda warnings. Id. at 75. According to the police version, the arrest did not occur until Boyd was outside his home and after he had made the incriminating statement. Id. at 74. According to Boyd, the arrest took place inside his house and before he made the statement. Id. Addressing the presumption of probable cause created by the grand jury indictment, we observed that "[t]he presumption is rebuttable, and may be overcome by evidence establishing that the police witnesses `have not made a complete and full statement of facts . . . that they have misrepresented or falsified evidence . . . or otherwise acted in bad faith.'" Id. at 76 (citation omitted). We concluded as follows: "At this preliminary stage, construing all inferences in the light most favorable to Boyd, a jury could reasonably find that the indictment was secured through bad faith or perjury, and that there was malicious prosecution of Boyd. Therefore, the issue of probable cause cannot be resolved by summary judgment." Id. at 77.
 
 
 31
 As in Boyd, we think that a jury could reasonably find that the indictment against McClellan was secured through bad faith or perjury. The District Court identified three "variations" in the version of events given by Smith as noted by McClellan: whether McClellan kicked the door into Smith or pushed the door into Smith; whether Smith's car was parked parallel on the street or at a diagonal; and whether McClellan punched Smith only a few times or ten to fifteen times. The District Court stated that these variations "all arise from the detailed, fast-moving series of events that occurred between [McClellan] and [Smith]." The Court concluded that it would "not hold that inconsistency alone in [Smith's] detailed description of the events raises a question of fact as to whether [Smith] engaged in fraud, perjury, suppression of evidence, or other bad faith conduct."
 
 
 32
 But it is not only the inconsistencies in Smith's version of the confrontation or even the gross disparities in the versions of the protagonists that suggest bad faith conduct in the procurement of the indictment. McClellan has offered evidence that Smith: was the instigator of the altercation; may have been intoxicated; lied to the arresting officer about McClellan's responsibility for the altercation; admittedly was displeased with the original grand jury result; supervised the investigation despite his obvious conflict of interest; reassigned the case because the officer originally assigned "wasn't handling the investigation properly"; urged the District Attorney's office that had employed him (and was to employ him again) to apply for the second grand jury; pressured a prosecutor to make a deal with a putative witness to give testimony in the case against McClellan; eventually procured the sole witness whose testimony enabled the case to be presented to the second grand jury; and altered his testimony before the second grand jury with regard to the placement of the vehicles after speaking with an officer who had been at the scene.
 
 
 33
 Taking McClellan's evidence as to the foregoing in the light most favorable to him, as we must, it could be concluded that Smith's prosecution of the case was impelled solely by a personal animus arising from an altercation for which McClellan was in no way responsible. Where evidence shows that a police officer, knowing that no crime has been committed, presses the prosecution of criminal charges "solely in order to further [the officer's] own personal goals," a claim of "bad faith" survives summary judgment. Marshall v. Sullivan, 105 F.3d 47, 55 (2d Cir.1996). Although the factual issues here are sharply disputed, the Indictment of McClellan, handed down by the second grand jury, "could reasonably be found to have been the result of conduct comparable to fraud or perjury." Id.
 
 
 34
 We reject McClellan's contention that any presumption of probable cause arising from the second grand jury indictment is negated by the return of a "No True Bill" by the first grand jury. This appears to be a question of first impression in this circuit. However, the case upon which McClellan relies, People v. Dykes, 86 A.D.2d 191, 449 N.Y.S.2d 284 (2d Dep't 1982) does not support the contention. In Dykes, a grand jury returned a "No True Bill" determination. Id. at 192, 449 N.Y.S.2d 284. After that grand jury refused to indict, the prosecutor made an ex parte motion for leave to resubmit the charges to a second grand jury. Id. The application was premised upon the prosecutor's "`belief that the dismissal was against the weight of the evidence' and that the dismissal was `neither based on the legal insufficiency of the evidence nor the absence of reasonable cause to believe that the defendant committed the dismissed charges.'" Id. The motion was granted, and the second grand jury returned a True Bill. Id. at 192-94, 449 N.Y.S.2d 284. The defendant then moved to dismiss the indictment. Id. at 194, 449 N.Y.S.2d 284.
 
 In affirming dismissal, the court stated:
 
 35
 [A] determination by the Grand Jury that the evidence before it does not warrant an indictment should end the matter and there should not be a resubmission unless it appears, for example, that new evidence has been discovered since the former submission; that the Grand Jury failed to give the case a complete and impartial investigation; or that there is a basis for believing that the Grand Jury otherwise acted in an irregular manner.
 
 
 36
 Id. at 195, 449 N.Y.S.2d 284. Thus, although the court in Dykes found that a factual showing sufficient to justify submission of the case to a second grand jury was lacking, it did recognize that newly discovered evidence could form the basis for resubmission. Newly discovered evidence in the form of an affidavit by Ronald Fordley, relating to a purported jailhouse admission by McClellan, was presented to the court that authorized the presentation of McClellan's case to a second grand jury. Although McClellan characterized the Fordley evidence as "inconsequential" and noted that Fordley was not even called as a witness at trial, the fact remains that the resubmission was properly authorized and the consequent grand jury indictment was valid to establish probable cause for prosecution.
 
 
 37
 There remains for review the District Court's decision that qualified immunity applied in any event to immunize Smith from all of McClellan's Fourth Amendment claims, an erroneous determination, as will be seen.
 
 IV. Qualified Immunity
 
 38
 The doctrine of qualified immunity offers protection for "government officials performing discretionary functions. . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). This doctrine is said to be justified in part by the risk that the "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." Thomas v. Roach, 165 F.3d 137, 142 (2d Cir.1999) (quoting Anderson v. Creighton, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). Qualified immunity also extends to protect a government actor "if it was `objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995); see Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000). It is also settled law that an "arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." Robison v. Via, 821 F.2d 913, 921 (2d Cir.1987) (emphasis supplied); see also Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); Cerrone v. Brown, 246 F.3d 194, 203 (2d Cir.2001).
 
 
 39
 The District Court first found "undisputed facts" demonstrating that "it was objectively reasonable for [Smith] to believe that probable cause existed to arrest [McClellan] for resisting arrest and disorderly conduct" and, therefore, that "[Smith] is entitled to qualified immunity with respect to the remainder of [McClellan's] Fourth Amendment claims." In its opinion on reconsideration, in specific reference to the felony assault charges lodged against McClellan, the District court found that "the only rational conclusion a jury could reach is that reasonable officers would disagree as to whether probable cause existed to charge [McClellan] with the[] three felony assault crimes." The Court erred in making these findings by resolving factual conflicts properly within the province of a jury. United States v. Rem, 38 F.3d 634, 644 (2d Cir.1994) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment."). And there were indeed many conflicting versions of the facts in this case.
 
 
 40
 The District Court, however, accepted only one version of the facts presented in arriving at its findings as to objective reasonableness as well as to reasonable police officer disagreement. For example, the District Court found that "[McClellan] does not dispute that [Smith] identified himself as a police officer." This is true, but, according to McClellan, Smith's self-identification was made in such a manner that McClellan did not believe that Smith was an officer because: Smith drove an unmarked car, honked his horn and made an obscene gesture, acted in an agitated and possibly drunken manner, and responded to McClellan's request to see identification in a "loud and threatening voice [stating] that `he didn't have to show any f____ing ID.'" The District Court also found that McClellan was aware that Smith "possessed a police radio[] and called for backup both in his car and while restrained by [McClellan]." This is partially true, but McClellan claims that he was unaware of the radio until after Smith charged out of the car at him, as he couldn't see a police radio or any other equipment in the car. Moreover, McClellan's testimony was that he did not figure out that Smith was actually a police officer until after he actually saw the radio and heard Smith call for backup, at which point he released Smith.
 
 
 41
 The District Court further found: "[McClellan] also admits to blocking [Smith] from exiting his vehicle." This too is true, but McClellan claims that he did not know Smith was an officer and that he was, in essence, acting in self-defense in trying to restrain what he thought was a drunken and agitated motorist who had been yelling threats at him. Also disputed is the District Court's finding that McClellan admitted "to restrain[ing] [Smith] after [McClellan] discovered [Smith's] serious injury and after [McClellan] witnessed [Smith] call for backup." McClellan claims not to have been immediately aware of Smith's injury and asserts that he let Smith go once he determined that he was actually a police officer.
 
 
 42
 Finally, there is nothing in the present record to indicate whether "reasonable officers would disagree" as to the propriety of Smith's actions, and the District Court's finding in that regard therefore was error. The District Court generally failed to heed the rule that resolution of genuine factual issues is inappropriate on motions for summary judgment based on qualified immunity. See Curry v. City of Syracuse, 316 F.3d 324, 337 (2d Cir.2003). The District Court's finding that "[t]he variations in [Smith's] testimony all arise from the detailed, fast-moving series of events" involving Smith and McClellan cannot serve to validate Smith's version of the events.
 
 CONCLUSION
 
 43
 The judgment of the District Court is vacated, and the case is remanded to the District Court for further proceedings consistent with the foregoing.
 
 
 
 Notes:
 
 
 [1]
 The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation
 
 
 [2]
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation
 
 
 [3]
 The action was discontinued in the District Court as against defendant City of Rensselaer